[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 30, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13161

_____

D. C. Docket No. 06-60082-CV-FAM

RICHARD M. HANLEY,
ELLEN HANLEY,

Plaintiffs-Appellants,

versus

NICHOLAS DANIEL ROY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 30, 2007)**

Before BARKETT, KRAVITCH, Circuit Judges, and TRAGER,[*] District Judge.

TRAGER, District Judge:

_____

[*] Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

Appellants, Richard and Ellen Hanley ("the Hanleys"), filed a petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention") and its implementing legislation, the International Child Abduction Remedies Act of 1988 ("ICARA"), 42 U.S.C. § 11603(b), in the Southern District of Florida, alleging that Appellee, Nicholas Daniel Roy ("Roy"), wrongfully removed their grandchildren to Florida and seeking their return to Ireland. The district court granted Roy's motion to dismiss the petition. The Hanleys now appeal.

## BACKGROUND

The Hanleys are the maternal grandparents and testamentary guardians of Roy's children – D.R. (born 1988), C.R. (born 1992) and R.R. (born 1997).[1] The Hanleys' daughter, Margaret, married Roy, a United States citizen, in England in 1986 and the two resided in England together. Margaret and Roy separated in 1995, attempted to reconcile in 1996, and then separated again that same year. At the time of the separation, the Hanleys were helping support Margaret and the children because the couple was financially unstable.

In 1997, shortly after the separation and the birth of their third child,

---

[1] Roy took all three children from Ireland; however, because the eldest child, D.R., is over 16, she is not subject to return under the Convention.

Margaret was diagnosed with cancer and wanted to return to Ireland. The Hanleys bought Margaret and the children a house in Ireland and, at Margaret's request, moved in with Margaret and the children to help care for them. Roy remained in England. He did not pay any child support and continued to have financial difficulties. A few years later, when Margaret's and Roy's marital home in England had to be sold, Roy rejoined the family in Ireland and moved into the Hanleys' home; however, he occupied a separate bedroom from Margaret.

In March 2000, her condition badly deteriorating, Margaret executed a will, designating the Hanleys as trustees of her estate and testamentary guardians of the children. Margaret died in November 2000 and her will was probated in August 2003.[2] Roy and the children continued to live with the Hanleys from 2000 until July 29, 2005, when Roy suddenly moved the children from Ireland to Florida without the Hanleys' knowledge or consent, leaving only a note behind.

The Hanleys instituted this action in December of 2005 by filing a petition for the return of their grandchildren pursuant to the Convention and ICARA. The Hanleys alleged that Roy wrongfully removed the children from their "habitual residence" in Ireland within the meaning of Article 3 of the Convention and

---

[2]As the district court noted, there is much dispute over whether Roy was aware of the will and the appointment of the Hanleys as testamentary guardians therein. At the very least, Roy admits he was shown a copy of the will in December of 2005.

refused to return the children. The Hanleys further asserted that they had "rights of custody" over the children within the meaning of Articles 3 and 5 of the Convention. The district court denied the motion and ordered a written response to the petition from Roy.

On March 14, 2006, Roy wrote a letter to the Hanleys, objecting to their acting jointly as guardians of his children. On March 16, 2006, Roy filed a motion to dismiss the emergency petition, arguing that the Hanleys did not have any "rights of custody" over the children under Irish law.

On March 31, 2006, the parties and their counsel appeared for an evidentiary hearing in federal district court in Florida. At the hearing, the trial court declined to take witness testimony; instead it relied on pleadings, affidavits and dialogue with counsel on applicable law. Subsequently, the court granted Roy's motion to dismiss the petition, finding that Roy's removal was not wrongful under Irish law. In re Roy, 432 F. Supp. 2d 1297, 1298 (S.D. Fla. 2006). Specifically, the district court found that the Hanleys' testamentary guardianship did not confer "rights of custody" under the Convention because: 1) "the mother appointed the grandparents to be guardians and not custodians, which she could have done"; and 2) Roy objected to joint guardianship with the Hanleys. In re Roy, 432 F. Supp. 2d at 1301. We review the district court's findings of law de novo and any of its

findings of fact for clear error.  Lops v. Lops, 140 F.3d 927, 935 n.6 (11th Cir. 1998).

## **DISCUSSION**

The narrow issue in this case is whether Roy's removal of the children from Ireland was wrongful under the Convention, such that the children should be returned to Ireland for a determination of the Hanleys' guardianship rights by an Irish court.

### *I.      The Purpose of the Hague Convention*

The Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  Convention, pmbl.  The Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings.  March v. Levine, 249 F.3d 462, 468 (6th Cir. 2001); Friedrich v. Friedrich, 78 F.3d 1060, 1063-64 (6th Cir. 1996).

To establish wrongful removal under the Convention, the Hanleys must

show that they had "rights of custody" and that they were exercising those rights when Roy removed the children in 2005. Specifically, in Furnes v. Reeves, 362 F.3d 702 (11th Cir. 2004), this Court held that, under the Convention, the removal of a child from his or her state of habitual residence is wrongful where the petitioner establishes by a preponderance of the evidence that: (1) the child has been removed or retained in violation of the petitioner's "rights of custody" (i.e., "rights relating to the care of the person of the child . . . either jointly or alone"); and (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Furnes, 362 F.3d at 712 (quoting in relevant part Articles 3 and 5 of the Convention) (citations omitted). The existence of "rights of custody" are determined by the law of the country in which the child habitually resides at the time of removal.[3] Convention, art. 3; Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session (Child Abduction) 426, 444, ¶ 64 (1981).

The Convention broadly defines "rights of custody" as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence" Convention, art. 5. These rights "may arise in particular by

---

[3] Here, Ireland was the children's place of habitual residence at the time of removal; accordingly, Irish law applies.

6

operation of law or by reason of a judicial or administrative decision, or by reason

of an agreement having legal effect under the law of the State." Convention, art. 3.

The intention of the Convention is "'to protect <u>all</u> the ways in which custody of

children can be exercised,' and the Convention favors 'a flexible interpretation of

the terms used, which allows the greatest possible number of cases to be brought

into consideration.'" <u>Furnes</u>, 362 F.3d at 716 n.12 (quoting Elisa Pérez-Vera,

Explanatory Report at 446-47, ¶ ¶ 71, 67 (emphasis in original)).

## II.    *Testimonial Guardianship under Irish Law*

The Hanleys were appointed "testamentary guardians" of the children by

Margaret's will[4] and, pursuant to section 7 of the Guardianship of Infants Act of

1964 ("Guardianship Act"),[5] were authorized under the laws of Ireland to act as

guardians of the children jointly with Roy, unless Roy objected.  Upon Roy's

---

[4] Margaret Hanley's probated will reads, in part, "I appoint the Said Richard Hanley and Ellen Hanley to be Guardians of my infant Children."

[5] Section 7(2) of the Guardianship Act grants a mother the power to appoint testamentary guardians by will.  Guardianship of Infants Act of 1964, § 7(2).  Section 7(3) of the Guardianship Act states, "[a] testamentary guardian shall act jointly with the surviving parent of the infant so long as the surviving parent remains alive unless the surviving parent objects to his so acting." Guardianship of Infants Act of 1964, § 7(3).  If the surviving parent objects, "the testamentary guardian may apply to the court for an order" enforcing the guardianship rights. Guardianship of Infants Act of 1964, § 7(4).
    Section 6(3) of the Guardianship Act explains the father's rights to guardianship upon the death of the mother, stating that "[o]n the death of the mother of an infant the father, if surviving, shall be guardian of the infant, either alone or jointly with any guardian appointed by the mother or by the court." Guardianship of Infants Act of 1964, § 6(3).

7

objection, the Hanleys could seek a court determination enforcing their joint guardianship rights.  Guardianship of Infants Act of 1964, § 7(4), (5).

As noted by the district court, in Ireland, "guardianship" encompasses "the duty to maintain and properly care for a child and the right to make decisions about a child's religion and secular education, health requirements and general welfare." In re Roy, 432 F. Supp. 2d at 1301 (quoting  F.N. and E.B. v. CO., [2004] 4 IR 311, 318 (High Court, Ir.) (quoting Shatter's Family Law, p. 531 (4th ed.))). Guardianship under Irish law is further described as follows:

> Guardianship is a concept often confused with custody.  In fact, it is not necessary that the guardian of a child be also its custodian and day-to-day caregiver.  Guardianship is altogether a more global responsibility.  The concept of guardianship relates not to the specific matters of a child's daily life, but to its overall welfare and upbringing.  Guardianship, in other words, concerns matters of overriding seminal importance to a child's upbringing, e.g. where he or she is educated, according to which religious belief he or she is to be reared, and whether the child should undergo serious medical treatment.
> Guardianship should not be seen solely as a right. It entails both rights and duties, in particular the duty to ensure that a child is properly cared for and that decisions relating to the child are made with his or her best interests at heart.

Geoffrey Shannon, Child Law, § 2-40, p. 46 (2005).  See also Geoffrey Shannon, The Family Law Practitioner, § I-034,  p. 118 (2000)  (providing same definition of guardianship).[6]

_____

[6] The district court, as well as both parties, regard the definition of guardianship provided by Geoffrey Shannon, a Solicitor and Senior Lecturer of Child Law at the Law Society of

The issues are whether the district court correctly determined that the Hanleys' status as testamentary guardians was not enough to accord them "rights of custody" under the Convention and whether the district court correctly determined that Roy's removal of the children constituted a proper objection to joint guardianship.

### III. *"Rights of Custody" under the Convention*

The district court held the Hanleys did not have "rights of custody" under the Convention, interpreting "rights of custody" to mean "the right to physical care and control" and being "fully responsible for the day-to-day care of the children." The district court further reasoned that because Irish law draws a distinction between guardianship and custody, only a custodial right, and not a guardianship right, could be considered a "right of custody" under the Convention. Therefore, the district court concluded, because the Hanleys were appointed "guardians," and not "custodians" of the children, they could not have "rights of custody" under the Convention.

The district court erred in narrowly defining "rights of custody" so as to exclude testamentary guardianship from its purview. "Rights of custody" is a term

Ireland, as authoritative, and rely on it in their respective arguments.

of art under the Convention and is "expressly defined" therein, Furnes, 362 F.3d at 711 (emphasis in original), as "rights relating to the care of the person of the child," Convention, art. 5. This Court has cautioned that, in applying the Hague Convention, "we must look to the definition of 'rights of custody' set forth in the Convention and not allow our somewhat different American concepts of custody to cloud our application of the Convention's terms." Furnes, 362 F.3d at 711. In making this determination, this Court has further cautioned that:

> it is crucial to note that the violation of a single custody right suffices to make removal of a child wrongful. That is, a parent need not have "custody" of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody. Further, he need not have a sole or even primary right of custody.

Id. at 714-15 (emphasis in original).

With this in mind, we turn to whether the Hanleys had "rights of custody" under the Convention. In order to make this determination, we need to first assess the types of rights the Hanleys were granted under Irish law by their status as testamentary guardians and then decide whether these rights fall within the ambit of "rights relating to the care of the person of the child" under the Convention.

As noted earlier, joint guardianship under Irish law involves "matters of overriding seminal importance to a child's upbringing, e.g. where he or she is educated, according to which religious belief he or she is to be reared, and whether

10

the child should undergo serious medical treatment," and entails "the duty to ensure that a child is properly cared for."  Geoffrey Shannon, Child Law, § 2-40, p. 46 (2005).  These rights are analogous to the rights we previously have found sufficient to create "rights of custody" under the Convention in Furnes v. Reeves.

In Furnes, the petitioner was party to a custody agreement granting him "joint parental responsibility," defined, inter alia, under Norwegian law as the right "to make decisions for the child in personal matters."  Furnes, 362 F.3d at 706-07. This right included a ne exeat right, which is the right to determine whether the minor child could live outside the country.  Id. at 707-08.  In determining whether these rights amounted to "rights of custody" under the Convention, we determined that a right "to make decisions for the child in personal matters" granted under Norwegian law "necessarily embraces a broad range of personal decisions, such as decisions regarding the personal care, protection, maintenance, and finances of the child" and that the child's care "would include everyday decisions about the child's shelter, food, clothing, education, and medical needs."  Id. at 713.  Importantly, we found that even though the petitioner may have been excluded from exercising decisions "concerning important aspects of the child's care" under applicable law, the petitioner, nonetheless, retained some decisions regarding aspects of the child's care and those rights "[fell] within the ambit of decisions relating to 'the care of the

11

person of the child' within the meaning of Article 5 of the Convention." Id. at 713-14, 714 n.11. Because the petitioner in Furnes additionally had ne exeat rights, there was no need to rest our holding entirely on the fact that petitioner had the right "to make decisions for the child in personal matters." However, the opinion's strong dictum indicated that that right "alone may well grant [petitioner] a 'right of custody' as defined under the Convention." Id. at 713.

As in Furnes, the Hanleys' status as joint testamentary guardians is sufficient to create "rights of custody" under the Convention. As guardians, the Hanleys were endowed with joint decision-making authority over the children's education, health, and religious life, see, e.g., F.N. and E.B. v. C.O., 4 IR at 318, and the Hanleys indisputably exercised their rights to care and to provide for the children pursuant to their lawful guardianship status. Although the Irish guardianship rights afforded to the Hanleys are different rights than the Norwegian right of joint parental responsibility and corresponding ne exeat right afforded to the petitioner in Furnes, both rights necessarily involve the "care of the person of the child" within the meaning of the Convention. Importantly, Irish courts agree, holding that guardianship rights under Irish law qualify as "rights of custody" under the Hague Convention. See, e.g., R.C. v. I.S., [2004] 2 I.L.R.M. 285, 294 (High Court, Ir.) (stating that a "guardian" may not have "custody of the child

12

under Irish law" but is still "a person who has 'rights of custody' . . . within the meaning of art. 5 of the [C]onvention"). See also Response of Ireland to the 2006 Questionnaire concerning the practical operation of the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, 1 (2006), available at http://www.hcch.net/upload/abd_2006_ie.pdf (equating guardianship rights under Irish law with "rights of custody," and commenting that some countries "which have no equivalent in Irish law" "have difficulties with the understanding of the notion" that persons afforded guardian status under Irish law "have guardianship rights and thus custody within the meaning of Article 3 of the Hague Convention."). Accord H (Abduction: Rights of Custody), [2000] 1 F.L.R. 201 (House of Lords, Eng.) (holding that an Irish court possessed "rights of custody" over removed child by virtue of petitioner's guardianship application, which had been pending in that Irish court one month before removal).

Thus, the substantive rights the Hanleys enjoyed as testamentary guardians under Irish law were sufficient to create "rights of custody" under the Convention.

## IV.    *Objection to Guardianship under Irish Law*

Alternatively, the district court held that the Hanleys' "rights of custody" were abrogated when Roy objected to the joint guardianship arrangement. The

13

district court characterized Roy's removal of the children from Ireland as a "constructive" objection to the joint guardianship arrangement with the Hanleys, thus, terminating the Hanleys' guardianship. In re Roy, 432 F. Supp. 2d at 1302 n.3. The district court then reasoned that because the Hanleys failed to go to an Irish court to confirm or enforce their guardianship, they were no longer guardians of the children and, therefore, did not possess the requisite "rights of custody" necessary for the return of their grandchildren.

Under the Guardianship Act, the testamentary guardian acts jointly with the surviving parent "unless the surviving parent objects to his so acting." Guardianship of Infants Act of 1964, § 7(3). If the surviving parent objects, "the testamentary guardian may apply to the court for an order under this section." Guardianship of Infants Act of 1964, § 7(4). A court has three possible responses to a guardian's application: (1) refuse to make an order, whereby the surviving parent remains sole guardian; (2) make an order that the guardian act jointly with the surviving parent; or (3) make an order that the guardian be solely responsible for the child to the exclusion of the surviving parent. Guardianship of Infants Act of 1964, § 7(5).

The district court determined that an objection by Roy to the Hanleys' testamentary guardianship status automatically abrogated their status – as opposed

14

to merely putting the Hanleys on notice that they should seek, if they so wished, a judicial determination pursuant to section 7 of the Guardianship Act. The legislative debates and legal commentary on the Guardianship Act seem to support this conclusion. See. e.g., Seanad Eireann, Vol. 57, March 18, 1964, Guardianship of Infants Bill, 1963, Committee and Final Stages, pp. 773-774 (Q: "If the surviving parent objects under section 7 to that guardian, is that guardian there and then completely extinguished for all time? " A: "No; he is there still but he does not act as a guardian so long as the surviving parent objects unless he can go to court and get himself established."); Geoffrey Shannon, Parental Responsibilities, National Report: Ireland, Law Society of Ireland, Dublin, 16, available at http://www2.law.uu.nl/priv/cefl/Reports/pdf2/Ireland.pdf (If the surviving parent objects, "the testamentary guardian cannot act as guardian unless, on application to the court, the court grants an order that the testamentary guardian shall act as guardian").

Assuming that an objection by Roy would have precluded the Hanleys from exercising their testamentary guardianship pursuant to section 7 of the Guardianship Act, and, thus, their "rights of custody" under the Convention until they obtained a court order, the timing of this objection is critical. The Convention makes clear that "rights of custody" are measured at the time of the removal.

15

Convention, art. 3. It is undisputed that Roy had not objected to the Hanleys' guardianship at any time before the removal and his letter formally objecting to the guardianship was dated almost eight months after the removal. This leaves the act of removal itself – what the district court dubbed Roy's "constructive" objection – as the only objection that could have terminated the Hanleys' guardianship, and, thus, their "rights of custody," at the time of removal.[7]

Roy's removal of the children to Florida cannot be considered a "constructive" objection sufficient to terminate the Hanleys' guardianship status under Irish law and, therefore, their "rights of custody" under the Convention. First, it is unclear whether Irish law permits constructive objections to the Guardianship Act; indeed, the legislative history cited above implies that guardians must be placed on actual notice of the objection – otherwise, they would not know of the need to go court to determine whether the guardianship would continue. See, e.g., Seanad Eireann, Vol. 57, March 18, 1964, Guardianship of Infants Bill, 1963, Committee and Final Stages, pp. 773-774. Second, as the leading Irish authority notes, it is not permissible to remove a child from Ireland during the course of an application pursuant to the Guardianship Act to determine issues of

---

[7] It is hard to understand how the district court could have concluded that the act of removal could have been intended as an objection by Roy to the guardianship when Roy himself claims he was unaware that the will granted the Hanleys joint guardianship until December 2005, several months after he left Ireland.

16

guardianship. Shannon, <u>Parental Responsibilities, National Report: Ireland</u>, at 20-21 (citing <u>H (Abduction: Rights of Custody)</u>, [2000] 1 F.L.R. 201). This is because, once a party serves the court with an application for guardianship pursuant to the Guardianship Act, the Irish court itself acquires "rights of custody" over the removed child by virtue of the pending application. <u>See, e.g.,</u> <u>H (Abduction: Rights of Custody)</u> [2000] 1 F.L.R. 201. As such, the district court's holding that Roy could void the guardianship by his self-help act of leaving the jurisdiction without prior notice, and, thus, deprive the Hanleys of the opportunity to obtain a judicial determination, severely undercuts the policies underlying the Guardianship Act as well as the authority of the Irish courts to determine guardianship disputes.

As to the Convention, permitting the very act which the Convention seeks to prevent – namely, flight – to constitute a constructive objection sufficient to terminate the Hanleys' "rights of custody" would make a mockery of the Convention. To the extent that Roy desired to object to the joint guardianship arrangement, this should have been expressed directly to the Hanleys so that proper guardianship hearings could be instituted in the courts of Ireland. To express an objection by removing children from their place of habitual residence with no prior notice to their guardians must be, and is, in clear violation of the Convention. For

17

the district court to deem this wrongful behavior as a "constructive" objection, and, therefore, allow the act of wrongful removal itself to nullify the Convention of its power to return wrongfully removed children rewards abduction and thwarts the Convention's very purpose.

As Roy could not evade Irish law and the Convention by giving notice of his objection to the joint guardianship arrangement by the act of removal, the removal of the children to Florida was insufficient to terminate the Hanleys' guardianship at the time of removal. Accordingly, the Hanleys both had and were actually exercising[8] their "rights of custody" at the time of removal, rendering Roy's removal wrongful.

## V. *Underlying Custody Dispute*

A district court considering an ICARA petition cannot decide the underlying custody dispute, but only has jurisdiction to decide the merits of the wrongful removal claim. Lops, 140 F.3d at 936; Friedrich, 78 F.3d at 1063-64; 42 U.S.C. § 11601(b)(4). In the instant case, the district court order referred to Roy as

---

[8] The district court did not make a finding whether the Hanleys were exercising their "rights of custody" in Ireland prior to the removal of the children to the Florida, instead focusing its analysis on whether Roy's objection abrogated the Hanleys' guardianship. There is nothing in the record to indicate that the Hanleys were not actually acting as joint guardians at the time of removal. In fact, the record is clear that Roy and the children were still living in the Hanleys' house while the Hanleys provided for the children, paying for private school tuition, clothing and household expenses until the day Roy removed them to Florida.

18

a "fit father," In re Roy, 432 F. Supp. 2d at 1298, and gave undue legal deference to Roy's post-wrongful removal objection to terminate the testamentary guardianship of the Hanleys. However, it was not for the district court to decide who may or should have post-objection custody of the children.

The order further states that the Hanleys are "free to use the Irish courts to enforce any rights that they may have under Irish law." Id. at 1303. It is precisely for this purpose that the children should be returned to Ireland until the guardianship of the children is properly determined by the appropriate Irish court.

## CONCLUSION

Roy is ordered to return the two minor children to Ireland to give the Hanleys an opportunity to institute proper proceedings pursuant to section 7 of the Guardianship Act. In the event Roy fails to do so promptly, the district court shall order the minor children turned over to the Hanleys to facilitate the return of the children. Accordingly, the holding of the district court is
REVERSED.