[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-12762

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 9, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00125-CV-WS

GARETH ALEXANDER BARAN,

Petitioner-Appellant,

versus

SUSAN ELIZABETH BEATY,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(May 9, 2008)**

Before BLACK and CARNES, Circuit Judges, and RESTANI[*], Judge.

BLACK, Circuit Judge:

---

[*] Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

Petitioner-Appellant Gareth Baran is an Australian citizen. On February 16, 2007, he filed a petition in the Southern District of Alabama seeking the return of his minor son pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and its implementing legislation, the International Child Abduction Remedies Act of 1988 ("ICARA"), 42 U.S.C. § 11603(b). In the district court, Respondent-Appellee Susan Beaty, the child's mother, conceded she wrongfully removed her son from Australia, his country of habitual residence. However, she argued the child should not be returned because he would face a grave risk of harm were he to be returned to Australia. The district court agreed, and denied the petition for return.

Baran contends the district court erred by (1) finding the conduct Beaty alleged was sufficiently grave to justify denying the child's return; (2) failing to require Beaty to show Australian officials would be incapable of or unwilling to protect the child upon his return; and (3) failing to consider whether sufficient safeguards (known as undertakings) could permit the child to safely return to his home country. Finding no error in the denial of Baran's petition, we affirm.

The only challenge Baran brings with respect to the district court's findings of fact is his contention that Beaty's testimony was inconsistent and uncorroborated. Baran has not shown the district court clearly erred by crediting

2

Beaty's testimony. Consequently, we draw the following facts from the district court's findings of fact. *Baran v. Beaty*, 479 F. Supp. 2d 1257, 1260-64 (S.D. Ala. 2007).

## I.  BACKGROUND

From October 2001 through August 2006, Gareth Alexander Baran, an Australian national, lived with Susan Elizabeth Beaty, a United States citizen from Daphne, Alabama, at their home in Altona, Victoria, Australia.  On March 11, 2006, Beaty gave birth to their son, Samuel, who is the subject of this petition.

In October 2001, Baran sustained debilitating injuries in an automobile accident, rendering him unable to work or care for himself for some time thereafter.  Beaty, a registered nurse, tended Baran and worked to support the household financially, paying Baran's child support obligations for his two children from a previous marriage.  (Those children, ages 16 and 12, visit and live with their father on a regular basis without court supervision.)

After his accident, Baran became depressed and began drinking heavily, becoming intoxicated on an almost daily basis.  It was not uncommon for Baran to drive while intoxicated or to pass out after an all-day drinking binge.  When drunk, Baran was violent and unstable.  He berated Beaty and intimidated her physically.  On occasion, he was physically abusive towards her.  On one such

3

occasion Baran slapped Beaty so hard she fell to the ground. Another time, he pushed her in the presence of his daughter, frightening and upsetting the child. On a separate occasion, while Beaty was pregnant with Samuel, Baran pinned her between a door and the wall, pushing on the door in a manner that applied intense pressure to her abdomen. On other occasions, Baran hurled furniture at Beaty and smashed the door of the couple's microwave oven in a fit of anger.

After Samuel was born, Baran's alcohol abuse and anger intensified. Baran began drinking all day every day, and participated only minimally in Samuel's care and supervision. Although there were times when Baran would assist in caring for Samuel, such occasions were isolated and infrequent.

Baran did not temper his abusive conduct when Samuel was present. One night when Samuel was less than a week old, Baran became intoxicated and decided he wanted to show his drinking companions "how big Sam's balls were." He took Samuel, undressed him, and carried him balanced on one hand into the night air before stumbling into a table, sending glassware flying as he did so.

On July 13, 2006, Baran subjected Beaty to a six-hour, expletive-laden barrage of verbal abuse and threats while she held Samuel in her arms. On that occasion, Baran screamed to Beaty he hated her, she was never going to see Samuel or her family again, and he was going to "bash her face in." To punctuate

4

the threat, Baran repeatedly swung a portable telephone at her head, causing Beaty to fear for her life. All the while, Beaty held Samuel and attempted to use her body to shield him. Samuel remained very quiet, but he cried out when Baran tore him from Beaty's arms and deposited him on a couch unsupervised. Despite these incidents of endangerment, there was no evidence Baran had ever beaten or otherwise physically harmed Samuel.

At various times Baran told Beaty in pointed terms she had "tricked" and "trapped" him with the pregnancy, he did not want another child, Beaty should not blame him if anything happened to Samuel, and she should have had an abortion. Baran informed Beaty when the child grew older, he would tell Samuel he did not want him. On at least two occasions, in the context of disagreements concerning his family or financial matters, Baran told Beaty to return to the United States, admonishing her to take Samuel with her because Baran wanted his freedom.

Based on this course of conduct, Beaty came to fear for her life and Samuel's life if they remained in Australia with Baran. Beaty felt isolated and believed none of Baran's family could provide any kind of support or intervention necessary to protect her and Samuel from Baran's explosive outbursts. Beaty never went to the Australian police or judicial system for help because she firmly believed those institutions would be unable to protect her. She never sought legal

5

custody of Samuel from any Australian tribunal because she believed no one in Australia was capable of helping or protecting her or Samuel.

On August 16, 2006, Baran received a settlement (in an amount equivalent to approximately $260,000 in United States currency) as a result of his 2001 automobile accident.  To celebrate, he immediately purchased a boat.  On August 19, the boat was delivered, and the record contains photographs of Baran, Beaty, and Baran's older children smiling aboard the boat.  The next afternoon, however, Baran came home from an errand to find a note in Beaty's handwriting reading, "Hey Babe, Went for a walk be back later. ♡ Susie & Boo Boo."  ("Boo Boo" was Beaty's pet name for Samuel.)  Beaty did not return home with Samuel that night, prompting Baran to launch a search and contact the police.  Late that night, the police informed Baran that Beaty and Samuel had been located aboard an airplane bound for the United States.

Since arriving in the United States, Beaty and Samuel have lived with Beaty's parents in Daphne, Alabama.  Beaty is adamant that she will never return to Australia under any circumstances because she fears Baran will harm her if she does.  Baran has had no face-to-face contact with Beaty or Samuel since they left Australia, although he and Beaty have had numerous telephone conversations.

On September 21, 2006, Baran submitted to the Australian Central Authority an "Application for the Return of a Child," pursuant to the Hague Convention. The application stated Beaty had removed Samuel to the United States without Baran's consent, and requested that Samuel be returned immediately. Under the heading "proposed arrangements for return of the child," the application read:

> The child should be returned forthwith to me at the family home in Altona, Victoria, Australia. I would like the mother to return with the child. As I am unemployed, I am unable to cover the costs associated with their travel. I am willing to meet the child at the Melbourne Airport upon arrival. If the [mother] does not return I am able to look after the said child alone.

(Petitioner's Exh. 1, at 4.) In his petition, Baran did not propose any alternative arrangements for Samuel's care.

On February 16, 2007, Baran filed a petition in federal district court, seeking Samuel's return. The court held an evidentiary hearing March 22, 2007, at which Beaty testified in person. Baran appeared by counsel.

At the hearing, Beaty introduced as evidence a May 1997 affidavit Baran's ex-wife had filed in Australian court during custody proceedings regarding Baran's older children. In the affidavit, the ex-wife averred Baran had slapped her, thrown her against the wall, kicked her in the abdomen while wearing heavy

7

work boots, and thrown furniture about the home during their relationship.  Beaty also introduced transcripts of phone conversations between herself and Baran she had secretly recorded.  Baran did not provide any testimony at the hearing, relying solely on the affidavit attached to his original petition, in which he denied having physically harmed Beaty during his relationship with her.

In an opinion dated March 28, 2007, the district court found although Beaty had wrongfully removed Samuel from the country without Baran's consent, Samuel would face a grave risk of harm were he to be returned to Australia. Noting Baran had not suggested conditions of return that would reduce or eliminate the risks Samuel faced on return, the court denied the petition.  Baran appeals.

## II.  DISCUSSION

In 1980, the United States became a signatory to the Hague Convention on the Civil Aspects of International Child Abduction (the Convention), ensuring its implementation through the International Child Abduction Remedies Act of 1988 (ICARA), 42 U.S.C. § 11603(b).  The Convention is designed "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  *Hanley v. Roy*, 485

8

F.3d 641, 644 (11th Cir. 2007) (quoting Convention, pmbl.). "The Convention and [the implementing legislation] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4). When a child has been wrongfully removed from his country of habitual residence, the Convention provides the non-abducting parent with a remedy of return, intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings. *Hanley*, 485 F.3d at 644; *March v. Levine*, 249 F.3d 462, 468 (6th Cir. 2001); *Friedrich v. Friedrich*, 78 F.3d 1060, 1063-64 (6th Cir. 1996).

When a parent files a petition for the return of a removed child, the first question courts must ask is whether the removal was wrongful. If so, the child must be returned "forthwith" unless the respondent establishes one of the affirmative defenses enumerated in the Convention. *See* Convention, art. 12-13; *Bader v. Kramer*, 484 F.3d 666, 668-69 (4th Cir. 2007). These affirmative defenses are to be narrowly construed to effectuate the purposes of the Convention and, even if proven, do not automatically preclude an order of return. *See Hague Int'l Child Abduction Convention: Text and Legal Analysis*, 51 Fed. Reg. 10,494,

9

10,509 (Mar. 26, 1986); *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005); *Friedrich*, 78 F.3d at 1067.

Beaty does not challenge the district court's finding that she wrongfully removed her son from Australia. However, she contends Samuel would face a grave risk of harm were he to be returned to Australia because of Baran's violence and drunkenness. *See* Convention, art. 13(b) (providing court may deny petition if respondent shows evidence of grave risk of harm to child's physical or psychological wellbeing). The district court agreed, and exercised its discretion not to order Samuel's return.

On appeal, Baran points to three alleged errors in the district court's analysis. He contends the district court erred by (1) finding the conduct Beaty alleged was sufficiently grave to justify denying Samuel's return; (2) failing to require Beaty to show that Australian officials would be incapable or unwilling to safeguard Samuel upon his return; and (3) failing to order return conditioned upon undertakings that would ameliorate any risk of serious harm to Samuel during the pendency of Australian custody proceedings. In response, Beaty takes the position that once the district court found returning Samuel to Australia would expose him to a grave risk of harm, it was entitled to deny the petition without inquiring further into any conditions that might permit Samuel's safe return.

10

## A. Grave Risk Exception

Article 13(b) of the Hague Convention states:

> Notwithstanding the provisions [providing a remedy of return for wrongfully removed children], the judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . wh[o] opposes [the child's] return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The respondent opposing a child's return bears the burden of establishing the grave risk exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

Whether a grave risk of harm to a child exists under the terms of the Hague Convention is a mixed question of law and fact, which we review *de novo*. *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007); *Silverman v. Silverman*, 338 F.3d 886, 896 (8th Cir. 2003).

### 1. Finding of abuse

Before denying Baran's petition, the district court heard testimony from Beaty, reviewed affidavits submitted by Beaty and Baran, and heard argument from counsel for both parties. After noting Baran's conclusory affidavit (which had been drafted in connection with his initial petition and not for the evidentiary hearing) did not provide any counter-explanation for the events to which Beaty

11

had testified, *see Baran*, 479 F. Supp. 2d at 1260 n.1, the district court found the following facts:

> Baran abuses alcohol on a daily or near-daily basis, that he is susceptible to lengthy drinking and gambling binges that in no way abated during the five months that Sam habitually resided with him, that he is only marginally able to care for his own basic needs, that he has no close family members or friends that could reasonably be expected to have meaningful involvement in Sam's day-to-day care and protection, that he is emotionally unstable and prone to uncontrolled destructive outbursts of rage, that he was physically and verbally abusive toward Beaty in Sam's presence, that he physically endangered Sam (both intentionally and unintentionally) when Sam lived under his roof, and that Baran repeatedly and pointedly stated to Beaty after Sam's birth that he did not want Sam, that Sam should have been aborted, that Sam would die if Sam "became an American," and that Beaty could not blame him if "something happened to" Sam.

*Id.* at 1270-71. Based on these facts, the district court concluded Beaty had met her burden of showing Samuel's return to Australia would expose him to grave risk of physical or psychological harm.

Baran challenges the district court's conclusion, contending that his drunkenness and temper are not the sort of grave risks to which Article 13(b) is directed. Citing persuasive authority, Baran contends that, to establish grave risk, Beaty was required to show *Samuel* had been mistreated—not that she herself had been verbally or physically abused. *See Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376-77 (8th Cir. 1995) (holding physical and sexual abuse of mother

12

insufficient to establish grave risk of harm to child); *Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (concluding verbal abuse of child's mother and sibling and shoving of child's mother insufficient to establish grave risk of harm to child). *But see Walsh v. Walsh*, 221 F.3d 204, 219-20 (1st Cir. 2000) (finding grave risk of harm to child established by evidence father disobeyed court orders, engaged in general acts of violence, and had severely beaten pregnant wife in front of child's siblings).

Although it is true there was no evidence to suggest Baran intentionally harmed Samuel, the district court was presented with evidence Baran had threatened to do so both before and after Samuel's birth. Moreover, the court heard testimony that Baran had placed Samuel in harm's way by abusing Beaty while she was pregnant, verbally berating Beaty for hours on end while she held Samuel in her arms, and handling newborn Samuel irresponsibly while drunk. To deny return, the district court was not required to find Samuel had previously been physically or psychologically harmed; it was required to find returning him to Australia would expose him to a present grave risk of physical or psychological harm, or otherwise place him in an intolerable situation. Convention, art. 13(b). The evidence presented was sufficient to support the court's conclusion that

Baran's violent temper and abuse of alcohol would expose Samuel to a grave risk of harm were he to be returned to Australia.

### 2. *Failure to examine country's ability to protect*

Baran contends the grave risk analysis does not end when a court concludes the conditions to which the child will be returned pose a grave risk of harm. Rather, he argues, before denying a petition for return, the court must first determine whether the child's country of habitual residence is capable of protecting the child from the identified risk.

Neither the Convention nor ICARA specifies the manner in which a reviewing court must assess whether a grave risk of harm to the child exists and whether that risk alone justifies denying a petition for return. Nevertheless, before denying a petition for return, some federal courts have required respondents to present evidence the child's country of habitual residence is not equipped to protect the child upon return. As counsel conceded at oral argument, this proposed "requirement" appears to have originated with the Sixth Circuit's opinion in *Friedrich*, in which that court stated in dicta:

> [W]e believe that a grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave

14

risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, *when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.*

*Friedrich*, 78 F.3d at 1069 (emphasis added). The Sixth Circuit's formulation has been repeated by courts throughout the country, and has been accepted by many lower courts as a governing principle of law. *See, e.g., In re Application of Adan*, 437 F.3d 381, 395 (3d Cir. 2006) (stating in dicta that the petitioner must demonstrate that "'the court[s] in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection'"); *Garcia v. Angarita*, 440 F. Supp. 2d 1364, 1381-82 (S.D. Fla. 2006); *In re D.D.*, 440 F. Supp. 2d 1283, 1299 (M.D. Fla. 2006). *But see Van De Sande v. Van De Sande*, 431 F.3d 567, 570-71 (7th Cir. 2005) (criticizing *Friedrich* formulation of grave risk and noting its overuse).

What makes the *Friedrich* standard attractive is its emphasis on the primacy of the country of habitual residence. ICARA emphasizes "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned . . . ." 42 U.S.C. § 11601(a)(4). This rule is designed to protect the interests of the state of habitual residence in determining any custody dispute, and to deter parents from unilaterally removing children in search of a more

sympathetic forum. *Simcox*, 511 F.3d at 604. Moreover, the requirement acknowledges comity between reviewing courts and courts in other signatory countries. *Friedrich*, 78 F.3d at 1068 ("In thinking about these problems, we acknowledge that courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly.").

Not all courts, however, have accepted the Sixth Circuit's interpretation of the grave risk analysis. Relying on the plain language of Article 13(b), many courts hold when a respondent proves returning a child would expose him to a grave risk of physical or psychological harm, the reviewing court has discretion to deny the petition for return outright. That position is consistent with the Convention's official commentary and with directives from the United States State Department.

In discussing the balance between the Convention's goals of protecting children and ensuring their speedy return, the official commentary to the Convention states, "[T]he interest of the child in not being removed from its habitual residence . . . gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an

16

intolerable situation." Elisa Pérez-Vera, *Explanatory Report: Hague Conference on Private International Law*, *in* 3 *Actes et Documents de la Quatorzieme Session* 426 (1980) (" Pérez-Vera Report "), ¶ 29.[1]  The commentary says nothing about a reviewing court's duty to assess the home country's ability to protect a child from harm—it says only that return need not be ordered when the risk of grave harm exists.

Similarly, in official comments regarding the use of an Article 13(b) defense, the United States State Department has made no mention of any obligation on the part of district courts to determine whether a country of habitual residence is able to provide children at risk of harm with protection or services. As one official comment explains:

> Under Article 13(b), a court in its discretion need not order a child returned if there is a grave risk that return would expose the child to physical harm or otherwise place the child in an intolerable situation.
>
> *   *   *   *
>
> An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child.  If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition.  Such action would

---

[1] *See Blondin v. Dubois*, 189 F.3d 240, 246 n.5 (2d Cir. 1999) ("*Blondin II*") (noting Pérez-Vera Report is recognized as official commentary to the Convention).

protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Hague Int'l Child Abduction Convention: Text and Legal Analysis*, 51 Fed. Reg. at 10510. The State Department's pronouncements, while not binding, are entitled to deference. *Baxter*, 423 F.3d at 373 n.7 ("Although not conclusive, the meaning attributed to treaty provisions by the government agencies charged with their negotiation and enforcement is entitled to great weight.").

Although a court is not barred from considering evidence that a home country can protect an at-risk child, neither the Convention nor ICARA require it to do so:

> [T]o define the issue not as whether there is a grave risk of harm, but as whether the lawful custodian's country has good laws or even as whether it both has and zealously enforces such laws, disregards the language of the Convention and its implementing statute; for they say nothing about the laws in the petitioning parent's country. The omission to mention them does not seem to have been an accident— the kind of slip in draftsmanship that courts sometimes correct in the exercise of their interpretive authority. If handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over, however severely the law of the parent's country might punish such behavior.

*Van De Sande*, 431 F.3d at 571.

To require a respondent to adduce evidence regarding the condition of the legal and social service systems in a country she has fled creates difficult problems

18

of proof, and appears not to have been contemplated by the Convention. Although we are cognizant of the Convention's goal of quickly returning abducted children to their countries of habitual residence, the text of the Convention and the commentaries on it place a higher premium on children's safety than on their return. Consequently, we decline to impose on a responding parent a duty to prove that her child's country of habitual residence is unable or unwilling to ameliorate the grave risk of harm which would otherwise accompany the child's return.[2]

## B. Undertakings

When a court determines that returning a child to his country of habitual residence would expose him to a grave risk of harm, it is "not bound to order the return of the child." Convention, art. 13. We review for abuse of discretion a district court's decision to deny a petition for return following a finding of grave risk of harm. *See Simcox*, 511 F.3d at 608 ("Once the district court determines that the grave risk threshold is met, only then is the court vested by the Convention with the *discretion* to refuse to order return . . . . Given the intensely

---

[2] As we discuss below, our rule does not prohibit courts from considering, as part of the discretionary decision to deny return under Article 13(b), whether the child's country of habitual residence may be able to protect the child from harm. We simply hold that the responding parent may meet her burden of proving grave risk of harm without adducing evidence regarding the home country's ability or willingness to offer the child protection.

fact-bound nature of the inquiry, district courts should be allowed adequate discretion.").

There is a long-standing tradition in English-speaking countries of protecting children from harm through court orders which require parents or guardians to take steps to ensure children's safety. *See* Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 157-58 (1999) (discussing legal origins of undertakings). The concept of court-ordered conditions on the return of children has been imported to Hague Convention cases by courts in the United Kingdom, Canada, Australia, and the United States. *Id.* at 161-68; *see also* Linda Silberman, *Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence*, 38 U.C. Davis L. Rev. 1049, 1076 (2005) (noting courts in common law countries have been willing to enter mirror orders, safe harbor orders, and other undertakings, while civil law countries have been more resistant to their use). Undertakings commonly include restraining orders, arrangements for transportation and lodging costs, and sometimes include provisions for a child's education. *See* Roxanne Hoegger, *What if She Leaves? Domestic Violence Cases Under the Hague Convention and the Insufficiency of the Undertakings Remedy*, 18 Berkeley Women's L.J. 181, 183 (2003). Undertakings may take many forms, including direct orders by the reviewing court

providing conditional return of the child and mirror-orders (also called safe harbor orders) requiring the petitioning parent to obtain a conditional custody order in the country of habitual residence before return of the child is ordered. Beaumont & McEleavy, *supra*, at 161-168.

Although the practice is far from uniform, some courts hold that once a respondent has shown a child is at grave risk of harm, the burden shifts to the petitioner to provide evidence that specific undertakings will alleviate the identified risk. *See, e.g., Danaipour v. McLarey*, 286 F.3d 1, 15 (1st Cir. 2002) (holding "proponent of the undertaking bore the burden of showing" country of habitual residence could provide adequate evaluation of alleged abuse); *see also Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995) (citing *Thomson v. Thomson*, 119 D.L.R. 4th 253 (Can. Sup. 1994) ("[I]n order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings' from the petitioning parent."). When the petitioner makes such a showing, the district court must factor the proposed undertakings into its discretionary decision to grant or deny return.

Undertakings are not mentioned explicitly in the Convention; however, they are appealing insofar as they may permit children to be safely returned to their countries of habitual residence, allowing the home forum to resolve child custody

21

and placement disputes within the context of the child's cultural and legal traditions.  For that reason, many commentators have advocated the use of undertakings as a desirable means of preventing reviewing courts from becoming embroiled in underlying custody disputes while effectuating the Convention's dual goals of ensuring children's safety and returning them to their countries of habitual residence.  *See* Merle H. Weiner, *Navigating the Road Between Uniformity and Progress:  The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 Colum. Hum. Rts. L. Rev. 275, 338 n.242 (2002) (collecting citations).

Other commentators, however, have taken the position that undertakings are an unenforceable imposition on the ability of a home country to resolve custody disputes under the law of its own nation.  Although reviewing courts are free to enter conditional return orders, they retain no power to enforce those orders across national borders.  *See* Carol S. Bruch*, The Unmet Needs of Domestic Violence Victims and Their Children in Hague Child Abduction Convention Cases*, 38 Fam. L.Q. 529, 543 (2004) (citing British study showing undertakings orders were violated in two-thirds of child abduction cases and honored in only one-fourth); Merle H. Weiner, *International Child Abduction and the Escape from Domestic Violence*, 69 Fordham L. Rev. 593, 678 (2000) ("[T]here is currently no remedy

for the violation of an undertaking. Contrary statements by some courts are simply wrong."); Beaumont & McEleavy, *supra*, at 165 ("[I]f one of the Article 12 or 13 exceptions is applicable the court should not exercise its discretion to return the child unless enforcement of the undertakings can be guaranteed."); *see also Danaipour*, 286 F.3d at 24-25) (noting inability of Swedish courts to order sexual abuse investigation or to limit visitation by allegedly perpetrating parent during pendency of custody proceedings). Because the court granting or denying a petition for return lacks jurisdiction to enforce any undertakings it may order, even the most carefully crafted conditions of return may prove ineffective in protecting a child from risk of harm.

The State Department has recommended any undertakings ordered pursuant to the Hague Convention be "limited in scope and further the Convention's goal of ensuring the prompt return of the child to the jurisdiction of habitual residence, so that the jurisdiction can resolve the custody dispute." *Danaipour*, 286 F.3d at 22 (citing Letter from Catherine W. Brown, Assistant Legal Adviser for Consular Affairs, United States Dep't of State, to Michael Nicholls, Lord Chancellor's Dep't, Child Abduction Unit, United Kingdom (Aug. 10, 1995), *available at* http://hiltonhouse.com/articles/Undertaking_Rpt.txt, last visited May 2, 2008). The State Department has explained "[u]ndertakings that do more than this would

appear questionable under the Convention, particularly when they address in great detail issues of custody, visitation, and maintenance." *Id.*

Although the State Department does not oppose the use of undertakings in all circumstances, it has cautioned:

> If the . . . court is presented with unequivocal evidence that return would cause the child a "grave risk" of physical or psychological harm . . . then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request. The development of extensive undertakings in such a context could embroil the court in the merits of the underlying custody issues and would tend to dilute the force of the Article 13(b) exception.

*Id.* at 25; *Simcox*, 511 F.3d at 607. In examining this official guidance, the Seventh Circuit has noted "undertakings are most effective when the goal is to preserve the status quo of the parties prior to the wrongful removal. This, of course, is not the goal in cases where there is evidence that the status quo was abusive." *Van De Sande*, 431 F.3d at 572 (quoting *Danaipour*, 286 F.3d at 25).

Undertakings may be useful in some situations, particularly in cases where parental violence is not alleged. When grave risk of harm to a child exists as a result of domestic abuse, however, courts have been increasingly wary of ordering undertakings to safeguard the child. *Simcox*, 511 F.3d at 606; *Danaipour*, 286 F.3d at 26 ("Where substantial allegations are made and a credible threat exists, a court should be particularly wary about using potentially unenforceable

24

undertakings to try to protect the child.").  As the Seventh Circuit explained in

*Van De Sande*:

> Return plus conditions ("undertakings") can in some, maybe many,
> cases properly accommodate the interest in the child's welfare to the
> interests of the country of the child's habitual residence.  Often the
> bulk of the evidence concerning risk of harm will be found in that
> country and the left-behind parent's defense to charges of abuse may
> be more difficult and costly to prepare and present in the country to
> which the abducter has fled. But in cases of child abuse the balance
> may shift against return plus conditions . . . . "[U]ndertakings are
> most effective when the goal is to preserve the status quo of the
> parties prior to the wrongful removal. This, of course, is not the goal
> in cases where there is evidence that the status quo was abusive."

431 F.3d at 571-72 (quoting *Danaipour*, 286 F.3d at 25).

> With those principles in mind, we turn to the facts of this case.  As the trial

court tells the story,

> in the waning moments of the [evidentiary] hearing, after the close of
> evidence, after oral arguments were concluded, and after a short
> recess in which the [court] decided to take the matter under
> submission, petitioner's counsel requested "one more bite at the
> apple" by mentioning, for the first time, the concept of
> "undertakings."  Specifically, petitioner's counsel requested to be
> given an opportunity, at some future date, to put on evidence of the
> purportedly "procedural issue" of possible conditions that this Court
> might impose in order to safeguard Sam upon his return to Australia.
> Because the March 22 hearing had essentially concluded, and because
> it was evident that petitioner had no further evidence or argument to
> present at that time, the Court adjourned the hearing with the caveat
> that petitioner's "undertakings" request would be reserved for further
> discussion if necessary.

25

*Baran*, 479 F. Supp. 2d at 1271-72.

No additional hearings were convened to address the question of undertakings, and on March 28, 2007, the district court denied the petition outright.

Baran contends it was error for the district court to deny the petition without first allowing him to present further evidence of possible undertakings.[3] We disagree. In its order denying the petition, the district court explained allowing Baran to present additional evidence would unduly delay the resolution of the proceedings.[4] The district court was under no obligation to continue the evidentiary hearing in order to permit Baran to produce evidence of undertakings, and Baran has provided no excuse for his failure to adduce such evidence at the March 22 hearing. Consequently, the district court did not abuse his discretion by denying Baran's request to propose undertakings at a future evidentiary hearing.

---

[3] It is not clear what evidence Baran would have presented had such a hearing been convened. After the court denied the petition for return, Baran submitted two relevant items to the court in connection with his motion for a new trial: an affidavit from an Australian social service manager providing general information about Australian child protective services and an affidavit from his sister, who volunteered to allow Samuel to live in her home. (Record Excerpt K, Exh. A & B.) Baran did not propose a specific safety plan for Samuel, suggest Samuel would qualify for protective services were he to be returned to Australia, or indicate how his sister (who once told Beaty that Baran's abuse was "none of her business," *Baran*, 479 F. Supp. 2d at 1262) would be able to protect Samuel in the future when she had failed to do so in the past.

[4] Article 11 of the Convention requires courts to resolve petitions within six weeks from their filing date or be ready to provide a reason why they have not done so. Convention, art. 11.

26

In deciding to deny the petition for return, the district court was limited to the evidence in the record before it. That evidence included the testimony and supporting exhibits presented at the March 22 hearing, and Baran's affidavit attached to the petition for return. The evidence did not contain any specific proposal for appropriate undertakings, such as a custody, visitation, or family-specific child welfare plan, which would ameliorate the grave risk of harm to which the district court found Samuel would be exposed on return.

In light of the evidence before it, the district court reasoned any proposed undertakings would be inappropriate given the nature of the case:

> There is abundant, credible evidence before the Court that Baran is a violent and abusive man with a lengthy history of inflicting physical and psychological abuse on those he ostensibly loves the most. His volatile personality, his propensity for alcohol abuse and his frequent statements of thinly veiled hatred for Sam and Sam's mother prior to Sam's removal combine to produce a highly combustible powder keg from which this Court is powerless to protect Sam. For this Court blithely to ship Sam back to Australia subject to elaborately crafted, well-meaning conditions that may or may not be enforced or enforceable by an Australian court would be to abdicate its overarching responsibility to protect this child from harm, while simultaneously entangling this Court in custody matters that exceed its authority and jurisdiction. This the Court will not do.

*Id.* at 1273.

Baran bore the burden of proposing undertakings that would ameliorate the grave risk of harm to which Samuel would be exposed on return to Australia, yet

27

he adduced no evidence on the question. Under the circumstances, the trial court reasonably concluded it could not guarantee Samuel's safety should it order him to be returned to Australia for further custody proceedings. We conclude the court's decision to deny the petition for return fell well within its discretion.

## III. CONCLUSION

The district court was presented with evidence that Baran has been violent in the presence of his son, has made threats to the child's safety, and due to injury and alcohol abuse is unable to care properly for himself or his child. Based on this evidence, the court did not err when it concluded returning Samuel to Australia would expose him to a grave risk of physical or psychological harm. Moreover, because the court was not presented with any proposed undertakings that could ameliorate the risk of harm to the child under the circumstances presented, the court did not abuse its discretion by denying the petition for return.

**AFFIRMED.**