[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10393
Non-Argument Calendar

_____

D.C. Docket No. 0:10-cv-61287-AJ

IVERSON TAYLOR,

Plaintiff - Appellant,

versus

KEYSHA NICHOLE LADONNA TAYLOR,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 20, 2012)

Before CARNES, BARKETT, and MARCUS, Circuit Judges.

PER CURIAM:

Mr. Iverson Taylor, a British citizen, has petitioned for relief under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,494 (March 26, 1986), and its implementing legislation, the International Child Abduction Remedies Act, 42 U.S.C. § 11603(b). He alleges that his wife, Ms. Keysha Taylor, an American citizen, has wrongfully retained their daughter, A.T., in Florida since February 2009.

## I.

The district court conducted an evidentiary hearing in this case. The court found Mr. Taylor untrustworthy and explicitly found that his testimony was not credible in a number of areas. Given Mr. Taylor's long history of deception and fraudulent activity, this finding is not clearly erroneous. See Baran v. Beaty, 526 F.3d 1340, 1342 (11th Cir. 2008) ("[The petitioner] has not shown the district court clearly erred by crediting [the respondent]'s testimony. Consequently, we draw the following facts from the district court's findings of fact."). Therefore, we accept the district court's findings of fact.

The Taylors were married in the United States in 2003. After Mr. Taylor was deported to the United Kingdom for failing to disclose his three theft convictions when he entered the United States, Ms. Taylor joined him. They lived

in the United Kingdom together from 2005 until 2009. A.T. was born there in 2007.

Mr. Taylor had constant money problems, and he frequently lied to his wife and others to swindle money from them. During their marriage, he was arrested for fraud, but those charges were ultimately dismissed.[1] Ms. Taylor found evidence in Mr. Taylor's emails that he was engaging in fraudulent activities. She also began receiving harassing phone calls from Mr. Taylor's creditors at their home. In November 2008, she received a call from a man who told her that if Mr. Taylor did not pay what he owed, "he would be dead and so would [she]." There were several more calls from that caller during November and December of 2008.

Ms. Taylor, an attorney licensed to practice in Florida, was able to support her family for a short time in the United Kingdom by working at a law firm. After A.T. was born, she supported the family with her maternity leave funds and then with funds paid to her based on a separation agreement with her employer. After this money ran out, however, she was unable to find another job in the United Kingdom. Mr. Taylor did not provide a reliable income, and the family was evicted from their home in the United Kingdom in December 2008. They were able to move into another apartment when, as Ms. Taylor testified, Mr. Taylor

---

[1] During the evidentiary hearing in the case currently before this Court, Mr. Taylor was arrested again on charges of misrepresentation that had been brought by three different people. Those charges were later dismissed.

"came up with a large amount of cash." She did not know the source of that cash but believed it was from illegal activities. Soon after that, they had difficulty paying the rent again. Mr. Taylor is currently living in a temporary location and plans to move if A.T. is returned to him. He remains unemployed and claims he supports himself with "outstanding debts and collections on old accounts."

Because of the financial difficulties, the fighting in their marriage, and the frightening phone calls, Ms. Taylor told Mr. Taylor she wanted to leave the United Kingdom and take A.T. with her. He refused to give her A.T.'s passport. He also told her that he "knew people" in the United Kingdom who could "take care" of her. It was only after she signed an agreement promising to bring A.T. back the next month that he gave her the passport. Ms. Taylor returned with A.T. to her parents' house in Florida.

When Ms. Taylor told Mr. Taylor that she would not be returning A.T. to the United Kingdom, he began to threaten her and her parents. He told Ms. Taylor's mother over the phone, "I am not gonna stop until I destroy your daughter. She's never gonna work in the United States again." In another call, he told Ms. Taylor that he knew people in Florida who could "take care" of her and he could "have somebody come to [her] house, and when [her] father opens the door, shoot him in the face." He also sent Ms. Taylor an email saying, "You are going to want my

4

mercy soon and you won't get it . . . God help you if anything happens to my child."

After Ms. Taylor returned to the United States, she filed for bankruptcy. She has since gotten a job and is now making $85,000 a year. Because of the remaining debts from her marriage, she testified that she still "live[s] paycheck to paycheck." She is unsure if she would be able to get a job in the United Kingdom if she and A.T. moved back, both because of the poor market and because her residency status is uncertain.[2]

## II.

The Hague Convention on the Civil Aspects of International Child Abduction is designed "[t]o protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007) (quoting Hague Convention on the Civil Aspects of International Child Abduction, supra p.1--2, pmbl.). Under the Convention, if a petitioner shows that a child was wrongfully removed from the country of her habitual residence, the court must order the child returned unless the respondent can establish one of the affirmative defenses provided for under the Convention. Baran, 526 F.3d at 1345.

---

[2] Ms. Taylor believes that the residency status she received in the United Kingdom in 2008 did not become permanent because she left the country less than a year after receiving it.

The district court concluded that Ms. Taylor had wrongfully taken A.T. from her habitual residence in the United Kingdom. She did not dispute that finding. Instead, she asserted that returning A.T. would expose her to a "grave risk" as described in Article 13(b). [3] The district court agreed that it would and did not order A.T. returned to the United Kingdom. Whether there is a "grave risk" to the child as defined in Article 13(b) of the Convention is a mixed question of law and fact, which we review de novo. Baran, 526 F.3d at 1345. We review the district court's factual findings only for clear error and give substantial deference to the credibility determinations made by the district court. Furnes v. Reeves, 362 F.3d 702, 710, 724 n.21 (11th Cir. 2004).

Article 13(b) provides that a state is not bound to return a child if "there is grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Baran, 526 F.3d at 1345 (quoting Article 13(b)). The respondent carries the burden of proving "by clear and convincing evidence" that the grave risk of harm exception applies. Id.; see also 42 U.S.C. § 11603(e)(2)(A).

The Convention presumes that a wrongfully taken child should be returned to her place of habitual residence. Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir.

---

[3] Ms. Taylor also asserted the affirmative defense that Mr. Taylor waited over a year to file the petition and A.T. was well-settled. The district court found that she had not proven that defense, and she has not raised that ruling in this appeal.

2000). For "grave risk" to be established, the potential harm must be "a great deal more than minimal," and the risk of that harm must be "grave." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000).

In this case, the district court provided two primary justifications for its finding that sending A.T. back to the United Kingdom would subject her to a "grave risk" of harm. First, the court reasoned that the anonymous death threats Ms. Taylor received were indicative of future violence: if one person threatened Ms. Taylor, there are likely others who "would not hesitate to threaten to kill, kidnap, or do physical harm to A.T. in order to get Mr. Taylor to pay what he owes."[4] The court made an explicit finding that Mr. Taylor's testimony concerning his current source of income (collection of "outstanding debts") was not credible and concluded that he had been and continued to be engaged in fraudulent activities.

Second, the court focused on the threats Mr. Taylor has made against Ms. Taylor: telling her he knew people in the United Kingdom and in the United States who could "take care" of her; threatening to send someone to shoot her father; threatening to ruin her professionally; promising her that she would want his mercy soon and would not get it. The court did not credit Mr. Taylor's assertion that he

---

[4] Although the unknown caller made no mention of A.T., the district court found that if the caller was willing to hurt Mr. Taylor's wife to recover the debt, he would also be willing to hurt Mr. Taylor's child.

never threatened Ms. Taylor or her parents and found that "Mr. Taylor threatened to use others to physically harm (and maybe even kill) Ms. Taylor."

As the district court recognized, this case is unique because the risk to A.T. stems not only from threats made by her father but also from threats made by an unknown third party. The district court's credibility determinations about the nature of the threats and Mr. Taylor's continued participation in fraudulent activities are not clearly erroneous. The court found that those fraudulent activities have already created---and likely will continue to create---a substantial risk of serious harm to Mr. Taylor's family. Based on the unique facts of this case and the district court's specific credibility determinations, the court did not err by determining that Ms. Taylor had established a grave risk of harm to A.T. if she is returned to live with Mr. Taylor in the United Kingdom.

**AFFIRMED**.