**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

HECTOR ARMANDO GIL-LEYVA,

 Plaintiff - Appellee,

v.

SHENOA TALEESE LESLIE,

 Defendant - Appellant.

No. 18-1209
(D.C. No. 1:17-CV-01406-KLM)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **PHILLIPS**, Circuit Judges.
_____

 Subject to limited exceptions, the Hague Convention on the Civil Aspects of

International Child Abduction (Hague Convention), Oct. 25, 1980, T.I.A.S. No.

11,670, and its implementing legislation, the International Child Abduction Remedies

Act (ICARA), 22 U.S.C. § 9001 *et seq.*, require courts in the United States to order

children returned to their countries of habitual residence if the children have been

wrongfully removed to or retained in the United States. Here, Defendant-Appellant

_____

 [*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

Shenoa Taleese Leslie and Defendant-Appellee Hector Armando Gil-Leyva agree that Ms. Leslie has since May 2016 wrongfully retained their two minor children, H.M.G. and H.F.G., in the United States and outside Canada, the children's country of habitual residence. At issue is whether the district court erred in determining that Ms. Leslie failed to show by clear and convincing evidence that the children face a "grave risk" of harm if returned to Canada. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm, recognizing that Ms. Leslie may provide evidence of harm and argue for custody of the children in the appropriate Canadian court.[1]

## BACKGROUND

Ms. Leslie, a U.S. citizen, and Mr. Gil-Leyva, a Canadian citizen, met in Colorado in late 2007 and began cohabiting there in March 2008. Ms. Leslie and Mr. Gil-Leyva never formally married. About September 2009, they relocated to Alberta, Canada,[2] where their children, H.M.G. and H.F.G., were born.[3] Ms. Leslie testified

---

[1] In a motion filed January 15, 2019, Mr. Gil-Leyva requests leave to supplement the record on appeal. We grant the request and admit Mr. Gil-Leyva's supplemental appendix.

[2] Ms. Leslie testified that Mr. Gil-Leyva had entered the U.S. on a visitor's visa, which he overstayed, and that he had committed a theft with a minor for which he was arrested and placed in removal proceedings. Ms. Leslie testified that Mr. Gil-Leyva accepted a voluntary departure to Canada and explained that she went with him there to "make sure that he followed the voluntary departure." Appellant's App. vol. 3 at 578:2. Mr. Gil-Leyva simultaneously disputes these allegations and admits undergoing "criminal & immigration removal proceedings." *Compare* Appellee's Br. at 12, *with id.* at 28.

[3] At the commencement of this appeal, H.M.G. and H.F.G. were six and three years old, respectively.

2

that she lived in Canada like a "human trafficking victim." Appellant's App. vol. 3 at 579:25. She testified that she endured physical abuse, occasionally in front of the children, and that she witnessed Mr. Gil-Leyva abuse alcohol, marijuana, and prescription narcotics. Regarding the children, she testified that Mr. Gil-Leyva spanked them, got angry and threw objects in their vicinity, and neglected their basic needs when left alone with them. She further testified that Mr. Gil-Leyva allowed unsafe living conditions, with non-child-resistant bottles of prescription narcotics, power tools, deconstructed machine parts, solvents, and other hazardous items lying in the home, some of which the children played with. And, she testified about noxious fumes in the home from Mr. Gil-Leyva cooking solvents, pennies, and vehicle parts in the kitchen. Mr. Gil-Leyva disputes many of these allegations.[4]

In November 2015, Ms. Leslie left home with the children and attempted to obtain passports for them at the U.S. Consulate in Calgary.[5] When the Consulate informed her that she needed the father's written consent for the application, Ms. Leslie arranged to attend a couple's counseling session with Mr. Gil-Leyva on the

---

[4] Mr. Gil-Leyva generally disputes these allegations with cursory assertions that Ms. Leslie is lying, though he also highlights some noteworthy inconsistencies between Ms. Leslie's account and her testimony in previous state-court proceedings. Because Mr. Gil-Leyva appears pro se, we liberally construe these arguments. *See de Silva v. Pitts*, 481 F.3d 1279, 1283 n.4 (10th Cir. 2007).

[5] Ms. Leslie asserts that she "spent months making a safe-exit plan," which she executed in November 2015. Appellant's Br. at 18. Mr. Gil-Leyva replies that there's no evidence Ms. Leslie made any plans to leave before November 2015. The record is indeed silent on this issue, but the dispute is immaterial.

condition that he consent to the passports. Mr. Gil-Leyva initially agreed, but upon inspecting the consent form at the Consulate, he refused to sign. Fearing Ms. Leslie would still try to leave the country, Mr. Gil-Leyva then returned home and reported an abduction.[6] Meanwhile, Ms. Leslie filed a claim for emergency custody in the Provincial Court of Alberta. But she withdrew the petition and returned home with the children[7] after learning that the process would take several months.[8]

Several months later, in May 2016, Ms. Leslie received word that her mother had been diagnosed with recurrence of a cancer for which she had been treated in 2009. Seeing an opportunity, Ms. Leslie convinced Mr. Gil-Leyva to give his consent for the children's passports so they could visit her ailing mother for a week and a half. About a week after arriving in Colorado, however, Ms. Leslie informed Mr. Gil-Leyva that she intended to stay beyond the agreed-upon date. Then, in October 2016, Ms. Leslie told Mr. Gil-Leyva that she would not return to Canada with the children. Mr. Gil-Leyva promptly booked a flight to Colorado,[9] hoping to discuss the parties'

---

[6] Police declined to treat the situation as an abduction, noting that the couple had no "reported domestic incidents" and that "child and family services have not yet heard from this family." *See* Appellant's App. vol. 1 at 73.

[7] Mr. Gil-Leyva alleges that authorities performed a welfare check after Ms. Leslie returned home, but he provides no authority for that assertion.

[8] Ms. Leslie alleges that Mr. Gil-Leyva's "erratic, frightening, dangerous, and negligent behaviors continued" after she returned home. Appellant's Br. at 19.

[9] Ms. Leslie avers that Mr. Gil-Leyva booked the trip despite that he "had been banned from the U.S. for ten years." Appellant's Br. at 19. Ms. Leslie appears to base this claim on speculation alone. *See id.* at 19 n.3 (reasoning that Mr. Gil-Leyva had

relationship in person. Ms. Leslie, in turn, obtained a protection order against Mr. Gil-Leyva[10] which restricted him to supervised visitations with the children. She then initiated state-court proceedings seeking full custody of the children.[11]

On June 9, 2017, Mr. Gil-Leyva filed this pro se action[12] in federal district court, seeking an order returning H.M.G. and H.F.G. to Canada under the Hague Convention and the ICARA. With the parties' agreement, a magistrate judge presided

---

"*likely* accrued more than one year of unlawful presence in the U.S." after voluntarily departing in 2009 and "is therefore inadmissible to the U.S. for ten years," according to 8 U.S.C. § 1182(a)(9)(B)(i)(II)) (emphasis added). Mr. Gil-Leyva, for his part, denies he "was ever barred from entry to the United States." Appellee's Br. at 16.

[10] Ms. Leslie initially obtained a temporary protection order when Mr. Gil-Leyva allegedly made "threats of physical violence against" her and "threatened to commit suicide." Appellant's Br. at 20; *but see* Appellee's Br. at 16 (asserting that these threats "never happened"). In a hearing with both parties present, a Garfield County, Colorado judge then made the protection order permanent. Mr. Gil-Leyva requested unsupervised-visitation rights at the hearing, but Ms. Leslie expressed concern for the children's "safety and for their mental health" and fear that Mr. Gil-Leyva might refuse to "return the children at the end of visitation." Appellant's App. vol. 2 at 398–99. Taking Ms. Leslie's concerns into account, the court ordered supervised visitation. On appeal, Ms. Leslie goes further, arguing that the judge found Mr. Gil-Leyva's "harm to the Children so severe that he ordered him limited to supervised visits with the Children." Appellant's Br. at 20–21. Though Ms. Leslie may read the order that way, Mr. Gil-Leyva is correct that the hearing's transcript doesn't expressly reflect such a determination.

[11] In her state-court petition, Ms. Leslie expressed "serious concerns" about Mr. Gil-Leyva's "ability to care for himself or to parent safely," citing his alleged "erratic, manic and abusive behavior." *See* Appellant's App. vol. 1 at 248. Mr. Gil-Leyva represents that those proceedings have been stayed under Article 16 of the Hague Convention.

[12] Mr. Gil-Leyva applied for and was appointed pro bono counsel, but counsel withdrew after a conflict arose. Mr. Gil-Leyva continues to represent himself on appeal.

over the entire case. In advance of a hearing scheduled for January 10, 2018, Mr. Gil-Leyva moved to appear via contemporaneous transmission under Rule 43(a) of the Federal Rules of Civil Procedure. The judge denied the motion on grounds that, as a pro se plaintiff, Mr. Gil-Leyva must litigate the case in person. Mr. Gil-Leyva took no further action until the day before the hearing, when he requested a four-to-six-week continuance so that he could make appropriate travel and legal preparations. He then telephoned into the hearing, despite the order denying his Rule 43(a) motion. The judge initially heard argument on whether to continue the hearing. She then denied a continuance and proceeded with the hearing as scheduled, overruling Ms. Leslie's objection to the reliability of Mr. Gil-Leyva's telephonic testimony.

On April 17, 2018, the magistrate judge issued a written order granting Mr. Gil-Leyva's request to return H.M.G. and H.F.G. to Canada. Ms. Leslie timely appealed and requested a stay of the order under Rule 62(c) of the Federal Rules of Civil Procedure. The judge granted the motion and stayed the order pending resolution of this appeal.

## ANALYSIS

Ms. Leslie raises two issues on appeal. First, she argues that the magistrate judge abused her discretion in permitting Mr. Gil-Leyva to appear telephonically at the January 10, 2018, evidentiary hearing after denying his Rule 43(a) motion to testify in that fashion. And second, she contends that the magistrate judge erred in determining that H.M.G. and H.F.G. do not face a "grave risk" of harm if returned to Canada. We address these issues in turn.

6

## I.  Contemporaneous Transmission

We review for abuse of discretion a district court's decision whether to allow contemporaneous transmission under Rule 43(a). *See Eller v. Trans Union, LLC*, 739 F.3d 467, 477 (10th Cir. 2013); *see also Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1087 (10th Cir. 2001). "An abuse of discretion is defined in this circuit as a judicial action which is arbitrary, capricious, or whimsical." *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1146 (10th Cir. 1990).

Under Rule 43(a), a district court may allow remote testimony only "[f]or good cause in compelling circumstances and with appropriate safeguards." Fed. R. Civ. P. 43(a). Mere inconvenience doesn't satisfy this standard. In general, the rule contemplates situations where a witness cannot appear in person "for unexpected reasons, such as accident or illness[.]" Fed. R. Civ. P. 43(a) advisory committee's note to 1996 amendment. Other reasons "must be approached cautiously." *Id.*

In this case, Mr. Gil-Leyva requested permission to testify remotely because he "resides in British Columbia, Canada, and currently lacks the financial means to travel to Colorado for the hearing." Appellant's App. vol. 1 at 264. The magistrate judge denied this request, explaining that, as a pro se litigant, "the logistics of an evidentiary hearing mandate that he appear in person . . . to litigate his case." *Id.* vol. 2 at 281. We see no error in this result, given that financial hardship isn't the type of "unexpected reason[]" that is "typically required in a showing of good cause for telephonic testimony." *See Eller*, 739 F.3d at 478. Nevertheless, at the hearing, the judge permitted Mr. Gil-Leyva to appear telephonically, overruling Ms. Leslie's

7

objection to the testimony's reliability. The judge made no express finding that good cause justified departing from her prior ruling; she stated only that "[t]he hearing is set for today, and it will go forward." *See* Appellant's App. vol. 3 at 523. Ms. Leslie contends that this unexplained departure constituted an abuse of discretion.

But Ms. Leslie overlooks the circumstances surrounding the departure. The magistrate judge denied Mr. Gil-Leyva's Rule 43(a) motion on December 15, 2017, nearly a month before the January 10, 2018, hearing. Despite this ample notice, Mr. Gil-Leyva waited until the day before the hearing to request four to six additional weeks to make travel and legal preparations. Unable to resolve this eleventh-hour request beforehand, the judge heard argument at the hearing, expressing concern that a continuance would prejudice Ms. Leslie, who had "expended time, energy, and money" to prepare for and attend the hearing. *Id.* at 516:1–17. Ms. Leslie echoed this concern in her argument, stressing that she had expended "ample resources and time" and had traveled "over 160 miles in a pending snow storm" to get to the hearing. *Id.* at 520:6–22. Ms. Leslie also worried that a continuance would simply prolong her "mental anguish" in dealing with the case. *Id.* at 520:23–24. With the benefit of this argument, the judge then denied a continuance and admonished Mr. Gil-Leyva for failing to make a diligent effort to prepare for and attend the hearing.

It was against this backdrop that the magistrate judge decided to proceed with the hearing and permit Mr. Gil-Leyva to testify remotely, notwithstanding the order denying his Rule 43(a) motion. The judge's rejection of Mr. Gil-Leyva's continuance motion predetermined this result—having denied that motion, the judge *had* to allow

8

remote testimony. After all, a decision holding Mr. Gil-Leyva to the order requiring his in-person attendance would have necessitated a continuance for him to travel from Alberta to Colorado, which would have prejudiced Ms. Leslie. Surely, in these circumstances, there was good cause to allow remote testimony. And, critically, *Ms. Leslie* effectively advocated for this result when she argued against a continuance. She cannot now claim that it was an abuse of discretion for the judge to honor *her request* to proceed with the hearing as scheduled, despite Mr. Gil-Leyva's absence. *See United States v. Deberry*, 430 F.3d 1294, 1302 (10th Cir. 2005) (a party cannot contend "that the district court erred in adopting a proposition that the party had urged the district court to adopt").

The broader legal context in which this case arises reinforces this conclusion. The Hague Convention provides that "[t]he judicial . . . authorities of Contracting States shall act expeditiously in proceedings for the return of children." T.I.A.S. No. 11,670, Art. 11; *see also Chafin v. Chafin*, 568 U.S. 165, 180 (2013) (Ginsburg, J., concurring) (noting the Hague Convention's aim to "facilitate custody adjudications, promptly and exclusively" in the child's country of habitual residence). This means "a district court has a substantial degree of discretion in determining the procedures necessary to resolve a petition filed pursuant to the Convention and ICARA." *West v. Dobrev*, 735 F.3d 921, 929 (10th Cir. 2013). In fact, in this context, nothing requires a court even to hold an evidentiary hearing. *See id.* Certainly, then, a court that does hold a hearing has some latitude to deviate from ordinary rules of procedure that might delay a final resolution.

9

This is especially true in this case, which has been ongoing since June 2017. The Hague Convention contemplates a judicial decision "within six weeks from the date of commencement of the proceedings." T.I.A.S. No. 11,670, Art. 11. Not only had this case already been pending for six months when the magistrate judge held a hearing in January 2018, but Mr. Gil-Leyva had asked to postpone the hearing for a period equivalent to the initial timeline within which child-abduction cases should resolve. Concerned that the case was passing the point of expeditious resolution, the judge decided to proceed without Mr. Gil-Leyva being physically present. Given the impetus to quickly resolve the abduction claim, the judge had good cause to proceed in this manner.

Finally, we are not persuaded that the magistrate judge committed reversible error in failing to implement "appropriate safeguards" to ensure the reliability of Mr. Gil-Leyva's remote testimony. Appellant's Br. at 25. In general, safeguards should ensure (i) accurate identification of the witness; (ii) protection against any outside influence on the witness; and (iii) accurate transmission. *See* Fed. R. Civ. P. 43(a) advisory committee's note to 1996 amendment. Here, the judge formally adopted no safeguards, though Ms. Leslie doesn't dispute that the person testifying was indeed Mr. Gil-Leyva and that his testimony transmitted accurately. Regardless, in ordering the children's return to Canada, the judge found no need to consider Mr. Gil-Leyva's "version of these events," because she found that Ms. Leslie's allegations, standing alone, had failed to show by clear and convincing evidence that Mr. Gil-Leyva "presents a grave risk of harm to the children." Appellant's App. vol. 2 at 304–05.

10

Mr. Gil-Leyva's testimony, then, did not prejudice Ms. Leslie, and any error in the judge's failure to adopt "safeguards" was harmless.

## II. Child Abduction

We therefore turn to Ms. Leslie's challenge to the magistrate judge's decision ordering H.M.G. and H.F.G.'s return to Canada. On appeal from grant of a petition for the return of a child under the Hague Convention and the ICARA, we review the district court's findings of fact for clear error and its conclusions about principles of domestic, foreign, and international law de novo. *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002); *see West*, 735 F.3d at 924 n.3.

### A. Prima Facie Case of Wrongful Retention

We stress that neither the Hague Convention nor the ICARA provides a means by which to decide "the merits of . . . child custody claims." 22 U.S.C. § 9001(b)(4). Instead, they seek "to prevent parents from abducting children in order to avoid the jurisdiction of courts with whose rulings they do not (or believe they will not) agree." *Shealy*, 295 F.3d at 1121. The treaty and legislation are thus designed to "prevent an international version of forum-shopping" and "defeat attempts to re-litigate custody matters." *Navani v. Shahani*, 496 F.3d 1121, 1128–29 (10th Cir. 2007). Consistent with these aims, our review is "limited to the merits of the abduction claim." *Shealy*, 295 F.3d at 1121 (quoting *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001)).

The Hague Convention and the ICARA mandate that "[c]hildren who are wrongfully removed or retained . . . be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4). A child is

11

wrongfully removed or retained outside a country if the petitioning parent shows by a preponderance of evidence that (i) the child was "habitually resident" in that country; (ii) the removal or retention breached the petitioning parent's custody rights under that country's laws; and (iii) the petitioning parent was exercising those rights at the time of the removal or retention. *Shealy*, 295 F.3d at 1122; *see also* 22 U.S.C. § 9003(e)(1)(A).

Mr. Gil-Leyva, the petitioning parent, has made this showing. After all, Ms. Leslie concedes that she has retained H.M.G. and H.F.G. outside Canada since May 2016, that Canada is the children's country of habitual residence, that her actions breached Mr. Gil-Leyva's custody rights, and that Mr. Gil-Leyva was exercising those rights at the time. *See* Appellant's Br. at 7 ("[Ms. Leslie] admits to wrongfully retaining the Children . . . ."). The sole issue on appeal is whether Ms. Leslie has established an affirmative defense (or "exception") to the children's repatriation to Canada.

### B.    Grave-Risk Defense to Repatriation

Though she invoked two defenses at the district court, Ms. Leslie presses a single defense on appeal: that she demonstrated by clear and convincing evidence a "grave risk" that the children's return to Canada would expose them to "physical or psychological harm or otherwise place the[m] . . . in an intolerable situation." *See* T.I.A.S. No. 11,670, Art. 13(b); 22 U.S.C. §9001(e)(2)(A). As the term implies, a "grave risk" means the "potential harm to the child must be severe, and the level of risk and danger . . . very high." *West*, 735 F.3d at 931 (quoting *Souratgar v. Lee*, 720

12

F.3d 96, 103 (2d Cir. 2013)); *see also Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) ("The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes.").

To satisfy her burden, Ms. Leslie testified that Mr. Gil-Leyva physically abused her and the children when they lived with him and that he negligently cared for the children and allowed unsafe living conditions in the home. The magistrate judge recited these allegations and found them insufficient to establish by clear and convincing evidence a grave risk of harm to the children. We agree.[13]

First addressing physical abuse of Ms. Leslie, the magistrate judge recited Ms. Leslie's testimony that Mr. Gil-Leyva "slapped" and "shoved" her several times and once "choked her with his hands," causing her to break a blood vessel in her eye and bruise on her neck. Appellant's App. vol. 2 at 304.[14] Though this testimony is deeply

---

[13] As we noted in *West*, several of our sister circuits have found the exception satisfied when a child would return to either (i) "a zone of war, famine, or disease" or (ii) a situation of "serious abuse or neglect, or extraordinary emotional dependence," provided the destination country is "incapable or unwilling to give the child adequate protection." *See* 735 F.3d at 931 n.8. But we declined to decide the requisite showing in our circuit because, whatever the standard, the respondent parent failed to meet it. *See id.* at 931. We again defer deciding the standard because Ms. Leslie's evidentiary showing is insufficient.

[14] Mr. Gil-Leyva denies that he abused Ms. Leslie, arguing that Ms. Leslie is lying and noting that she has provided contradictory testimony regarding such abuse in this case and in prior state-court proceedings. The evidence for Mr. Gil-Leyva's abuse is indeed mixed. For example, in the prior state-court hearing for a permanent protection order, both Ms. Leslie and her sister testified that Mr. Gil-Leyva choked Ms. Leslie when they lived in Colorado. But Ms. Leslie also testified that there was no "physical violence" when the family lived in Canada, Appellant's App. vol. 1 at 121, which seems to contradict her account in this litigation. In any case, we needn't

13

concerning, and undeniably will figure in any Canadian custody proceedings, spousal abuse is relevant for Article 13(b) purposes only if it "seriously endangers" the child. *See Khan v. Fatima*, 680 F.3d 781, 787 (7th Cir. 2012). Evidence of a "clear and long history of spousal abuse" may suffice to show a propensity for child abuse, *see Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000), but isolated incidents of abuse generally demonstrate a risk of harm only to the spouse. At a minimum, the spouse must "draw a connection" showing that the risk such abuse poses to her "constitute[s] a grave risk to the children." *See Charalambous v. Charalambous*, 627 F.3d 462, 468 (1st Cir. 2010). Ms. Leslie failed to do so in this case.

Next addressing physical abuse of the children, the magistrate judge recited Ms. Leslie's testimony that Mr. Gil-Leyva spanked H.F.G. "only once" and H.M.G. six times "with an open hand," leaving "marks" on their "bare bottoms." Appellant's App. vol. 2 at 303.[15] Certainly, a parent who is "in the habit of striking the children," even for disciplinary purposes, might pose a grave risk of harm to them. *See Ermini v. Vittori*, 758 F.3d 153, 165 (2d Cir. 2014) (citation omitted). But the described spankings, though again perhaps a subject for any Canadian custody proceedings, do not suffice to show a grave risk of harm. *Cf. Simcox v. Simcox*, 511 F.3d 594, 608–09

---

decide the truth of Ms. Leslie's allegations of abuse. Even assuming their truth, the allegations fail to sustain a grave-risk defense.

[15] Mr. Gil-Leyva disputes that he spanked H.F.G., arguing that Ms. Leslie provided inconsistent testimony on whether she saw or just heard the spanking and on whether H.F.G. was ten or 11 months old at the time. But these arguments are nonresponsive to the *fact* of the spanking. Further, Mr. Gil-Leyva concedes that he spanked H.M.G. six times and left marks on H.M.G.'s skin.

(6th Cir. 2007) (considering it a "close question" that even "repeated beatings, hair pulling, ear pulling, and belt-whipping" established a grave risk of harm). Likewise, though Ms. Leslie testified that Mr. Gil-Leyva would occasionally "get angry and throw things around," she allowed that he "never hit the children with those items." Appellant's App. vol. 2 at 302–03. And she proffered no evidence that Mr. Gil-Leyva's erratic behavior would constitute a credible threat to the children's safety upon their return.

On appeal, Ms. Leslie retreats somewhat from her allegations of physical abuse, acknowledging that the children "experienced minimal harm through family violence." Appellant's Br. at 30. Instead, she pivots to allegations of psychological harm *resulting from* Mr. Gil-Leyva's physical abuse of both her and the children—allegations relatively underdeveloped in the district court. Along this line, she argues that the children are at grave risk of psychological damage from Mr. Gil-Leyva's violent behavior, even if that behavior poses no grave risk of physical harm to them. Though she may develop this theory in Canadian court, the record in this case provides no support for it.[16]

---

[16] The magistrate judge had no occasion to address a theory of psychological harm because Ms. Leslie made only vague allusions to it in her filings and didn't raise it at the evidentiary hearing. Notably, Ms. Leslie doesn't argue that the judge erred in failing to consider this theory; instead, she subtly shifts the focus from physical to psychological harm, citing the same underlying allegations of physical abuse that she *did* make at the hearing. But just as that abuse fails to show a grave risk of physical harm, it fails to support a grave risk of psychological harm.

Ms. Leslie alleges that the children will suffer from "[w]itnessing a pattern of violence between" her and Mr. Gil-Leyva. *See id.* But she simultaneously claims that she either cannot or will not return to Canada. Presumably, that "removes any risk of the children witnessing any future abusive acts" against her. *See Charalambous*, 627 F.3d at 469. Moreover, though repatriation may cause "unavoidable psychological harm" to children exposed to spousal abuse in the past, *see Souratgar*, 720 F.3d at 104, Ms. Leslie testified that the only abuse the children ever witnessed was Mr. Gil-Leyva occasionally slapping her on her "back side very hard," Appellant's App. vol. 2 at 304. Though it is debatable that such contact would trigger grave psychological harm upon the children's return to Canada, any such argument rests on speculation. *See Souratgar*, 720 F.3d at 104. Notably, neither party has requested a psychological evaluation of the children to assess the effects of any of Mr. Gil-Leyva's past abuse. *See id.* The same issue arises with Ms. Leslie's argument that the children will suffer psychological harm from Mr. Gil-Leyva spanking them or throwing things at them. Ms. Leslie has adduced no expert testimony or evidence that the children suffered emotionally in the past or that they would unavoidably suffer from spanking or thrown objects in the future.

Finally, the magistrate judge recited Ms. Leslie's testimony regarding Mr. Gil-Leyva's negligence in caring for the children and allowing unsafe living conditions in the home. This included testimony that Mr. Gil-Leyva left non-child-resistant bottles of prescription medications "within reach of the children"; that his prescription usage made his behavior "pretty manic"; that, on the "less than five" occasions Ms. Leslie

16

left him alone with the children, he neglected to change their diapers; that once, he fell into a "narcotic induced sleep" during which he was "completely unaware" of the children's needs;[17] that he sometimes "put a child in the front seat" of his work van and once "used a tie-down strap in the back of the van for a child seat"; that he made soap and shoes and disassembled sewing machines, leaving their parts "all over the house" along with other dangerous items, including "[p]ower tools, solvents, screws, nails, glues, [and] choking hazards," some of which the children occasionally played with; and that "it was not abnormal" for him to "leave power tools plugged in." *See* Appellant's App. vol. 2 at 303–04.[18] Ms. Leslie further testified—though the judge didn't expressly address—that Mr. Gil-Leyva cooked solvents, pennies, and vehicle parts, producing fumes that made the home "noxious" and "uninhabitable." *See id.* vol. 3 at 590:19–591:10.

Though the judge considered Ms. Leslie's description of the home as being an "environment which may not be safe or healthy for children," she found significant the absence of evidence that the children had suffered any harm when they lived with Mr. Gil-Leyva. *Id.* vol. 2 at 305 (finding this "indicative that the conditions may not have been as terrible as alleged"). We agree. If the children suffered no harm from

---

[17] Though Mr. Gil-Leyva disputes the extent to which he abused prescription medications when the children lived in Canada, he doesn't dispute that, on at least a few occasions, his narcotic usage interfered with his ability to care for the children.

[18] Some of these allegations appear to exceed mere negligence, but both the magistrate judge and the parties refer to them as such. Whatever their label, these allegations fail to demonstrate a grave risk of harm to the children.

17

Mr. Gil-Leyva's alleged negligence when they were younger and more vulnerable, we struggle to see how they face a grave risk of harm now.[19] And while past harm is not required to establish a grave risk of future harm, it is probative of whether the children will suffer upon returning to the same circumstances. *See Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008).

Ms. Leslie counters that a greater risk of harm now exists because she will not be in the home to "safeguard the Children," for example, from playing with plugged-in power tools or open bottles of medications. Appellant's Br. at 31. But Ms. Leslie has not demonstrated by clear and convincing evidence that these dangers present so grave and credible a threat that the children cannot safely return to Canada without her protection. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996) ("The person opposing the child's return must show that the risk to the child is grave, not merely serious.") (citing Public Notice 957, 51 Fed. Reg. 104,494, 10,510 (Dep't of State Mar. 26, 1986)); *see also Walsh*, 221 F.3d at 218 ("[T]he harm must be a great deal more than minimal."). We sympathize that the circumstances in which Mr. Gil-Leyva lives are not ideal for children, but the grave-risk defense "may not be used as

---

[19] Indeed, many of Mr. Gil-Leyva's questionable behaviors are likely non-factors at this point. For example, it is doubtful that either child still wears diapers. Further, though Ms. Leslie alleged that Mr. Gil-Leyva cooked items that produced noxious fumes, she described that as a "phase" that lasted "[s]everal months," *see* Appellant's App. vol. 3 at 590:19–591:10, and she offered no evidence that Mr. Gil-Leyva would again take up those habits in the future. In other respects, though, Mr. Gil-Leyva's negligence might pose a greater risk of harm to the children now that they are older. The children, for example, might be more adept at switching on and handling plugged-in power tools.

a vehicle to litigate (or relitigate) the child's best interests." *Danaipour v. McLarey*, 286 F.3d 1, 14 (1st Cir. 2002) (quoting Public Notice 957, *supra*, at 10,510). These are matters for child-custody proceedings in the proper forum—here, Canada.

### C. Remedy

Because Ms. Leslie failed to clearly and convincingly establish an Article 13(b) defense to repatriation, H.F.G. and H.M.G. must be "promptly returned" to Canada. *See* 22 U.S.C. § 9001(a)(4). The magistrate judge entered an order accordingly but clarified in dicta that she was only ordering the children's return to Canada, not to Mr. Gil-Leyva's home. She added that, as Canadian law permits, Ms. Leslie may take certain actions to oppose the children's return to Mr. Gil-Leyva's home; for example, Ms. Leslie may accompany the children back to Canada and reside with them, separate from Mr. Gil-Leyva, while litigating their custody in the appropriate Canadian court. Ms. Leslie now argues that these suggestions amount to unworkable "undertakings" which fail to guarantee the children's safety. Appellant's Br. at 35–41. This argument is misguided.

In cases where a child faces a grave risk of harm in its country of habitual residence, a court may attach conditions to a return order to ensure that the child isn't subject to "short-term harm" upon returning. *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995). Such "undertakings" often include "restraining orders, arrangements for transportation and lodging costs, and sometimes include provisions for a child's education." *Baran*, 526 F.3d at 1349. Here, however, the magistrate judge attached no such conditions to her return order; indeed, she flatly recognized her inability to

"dictate who should exercise custody over the children" in Canada. Appellant's App. vol. 2 at 306 (citation omitted). Instead, her dictum regarding Ms. Leslie's options was intended to "emphasize that the Hague Convention addresses only the return of the children to a jurisdiction and not to a particular person." *Id.* at 307.[20]

Ms. Leslie protests that the magistrate judge substituted suggestions to "mitigate potential harm" for a determination "whether . . . harm actually exists in the home." Appellant's Br. at 35. That is, the judge suggested mitigatory action "to excuse herself from making findings" about harm to mitigate. *See id.* But the judge plainly found that the children do not face a grave risk of harm in Mr. Gil-Leyva's home; she simply noted that, *even assuming* such a risk, she wasn't ordering the children back to that environment. Ms. Leslie counters that even making suggestions presupposes a grave risk of harm. *See id.* at 38 ("Why is the [judge] suggesting remedies if there is no grave risk of harm?"). Again, the judge found no grave risk of harm but made suggestions to assuage Ms. Leslie's fear about such a risk.

Ignoring all this, Ms. Leslie contends that the magistrate judge's suggestions are unworkable and therefore fail to ensure the children's safety. She notes, for

---

[20] Neither the Hague Convention nor the ICARA provides that a child ordered to return to its country of habitual residence must return to the petitioning parent's home. But Ms. Leslie contends that a return order must account for whether the child will, in reality, return to an abusive home. The argument is legally sound but factually inapposite. *See Van De Sande*, 431 F.3d at 571 ("The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody."). The magistrate judge found that the children will not face a grave risk of harm in Mr. Gil-Leyva's home, and thus, the judge had no obligation to account for potential harm in that home.

example, that she "has no lawful immigration status" in Canada and thus "cannot get a job" to support the children, pay for a place to live, or hire an attorney. *See id.* at 37. But the "workability" of the judge's non-binding suggestions is irrelevant. Absent a predicate finding that the children face a grave risk of harm in Mr. Gil-Leyva's home, the judge had no obligation to craft workable undertakings to "ameliorate the . . . harm." *See Baran*, 526 F.3d at 1352. Instead, the judge was required to order the children's unconditional return to Canada, which she did.

## CONCLUSION

For the above reasons, we affirm the district court.

Entered for the Court

Gregory A. Phillips
Circuit Judge

21

No. 18-1209, <u>Gil-Leyva v. Leslie</u>
**BRISCOE**, Circuit Judge, concurring in part and dissenting in part.

I concur in part and dissent in part. I agree with the majority that the magistrate judge did not abuse her discretion in permitting Gil-Leyva to appear telephonically at the January 10, 2018 evidentiary hearing. I disagree with the majority's conclusion, however, that the magistrate judge correctly "found that the children do not face a grave risk of harm in . . . Gil-Leyva's home." O&J at 20. In my view, Leslie's testimony describing the conditions of Gil-Leyva's home, combined with her testimony describing Gil-Leyva's addiction and mental health issues and seriously neglectful parenting style, constituted clear and convincing evidence that the conditions in his home present so grave and credible a threat that the children cannot return there without her protection. I therefore conclude that the proper course in this case is to remand to the magistrate judge to hear further evidence regarding whether there are other viable living arrangements for the children in Canada other than living with Gil-Leyva.

I

Article 13b of the Hague Convention states, in pertinent part, that "the judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . [who] opposes its return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13b. "Whether there is a 'grave risk' of harm under the Convention is a mixed question of law and fact and thus review is *de novo*." <u>Simcox v. Simcox</u>, 511 F.3d 594, 601 (6th Cir. 2007).

The Hague Convention does not define the phrases "grave risk" or "intolerable situation." The circuit courts appear to agree, however, that "a child is exposed to a 'grave risk' of harm within the meaning of Article 13(b) . . . in cases of serious abuse or neglect . . . ." West v. Dobrev, 735 F.3d 921, 931 n.8 (10th Cir. 2013) (citing cases from the Second, Third and Sixth Circuits). "[C]ourts that have confronted abusive situations tend to refuse to order the return of the children, at least where the abuse could be characterized as very serious." Simcox, 511 F.3d at 605 (citing cases). That said, "even when confronted with a grave risk of harm, some courts have exercised the discretion given by the Convention to nevertheless return the child to the country of habitual residence, provided sufficient protection was afforded." Id. (quotations and brackets omitted). "That protection may take the form of 'undertakings,' or enforceable conditions of return designed to mitigate the risk of harm occasioned by the child's repatriation." Id. "The determination of whether any valid undertakings are possible in a particular case is inherently fact-bound and the petitioner proffering the undertaking bears the burden of proof." Id. at 605–06 (quotations omitted).

Article 13 directs reviewing courts, when assessing an alleged grave risk of harm, to "take into account the information relating to the social background of the child[ren]." Hague Convention, Art. 13 ("In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central authority or other competent authority of the child's habitual residence."). Courts have interpreted this directive as requiring "the court [to] consider the environment in which the child will reside upon

2

returning to the home country," as well as the nature of the individuals with whom the child would live. <u>Nunez-Escudero v. Tice-Menley</u>, 58 F.3d 374, 377–78 (8th Cir. 1995).

Notably, the Sixth Circuit has concluded "that Hague Convention cases dealing with abusive situations can be placed into three broad categories." <u>Id.</u> at 607. "First, there are cases in which the abuse is relatively minor." <u>Id.</u> "In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a '*grave* risk' or otherwise place the child in an '*intolerable* situation' under Article 13b." <u>Id.</u> "Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." <u>Id.</u> at 607–08. "In these cases, . . . unless the rendering court can satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody, the court should refuse to grant the petition." <u>Id.</u> at 608. "Third, there are those cases that fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable." <u>Id.</u> "Whether, in these cases, the return of the child would subject it to a 'grave risk' of harm or otherwise place it in an 'intolerable situation' is a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." <u>Id.</u> "Even in this middle category, undertakings should be adopted only where the court satisfies itself that the parties are likely to obey them." <u>Id.</u>

3

II

In this case, the magistrate judge noted, in terms of neglect, "that . . . Gil-Leyva habitually left non-child resistant bottles of prescription medication within reach of the children in the past." Aplt. App., Vol. 2 at 303. The magistrate judge also noted that Leslie testified that "[m]ore than once, she found their older child 'holding a bottle of pills and shaking it.'" Id. (quoting Tr. at 85). Leslie also testified that "Gil-Leyva's prescription use made his waking/sleeping pattern 'erratic' and that his behavior became 'pretty manic.'" Id. (quoting Tr. at 93). Leslie testified "that on '[t]he very few occasions [on] which he had been solely responsible for child care, [she] would return to find that diapers hadn't been changed,'" and "[o]n one occasion, he was in a narcotic induced sleep with the child awake and he was unrousable, sleeping, had taken sleeping medication, and was completely unaware.'" Id. (quoting Tr. at 78, 80). According to Leslie, "she had," in total, "left the children in his care 'less than five times' for 'maybe three hours maximum.'" Id. (quoting Tr. at 94). "Leslie also testified that '[h]e took up hobbies such as soap making and shoe making, and he would order sewing machines from the internet and disassemble them at the kitchen table,' leaving parts[, including power tools, solvents, screws, nails, glues, and choking hazards,] all over the house including the kitchen and the living room." Id. at 303–04 (quoting Tr. at 81). On several occasions, Leslie found her children "playing with items that were definitely a choking hazard, if not a burn hazard, because there were often chemical solvents.'" Id. at 304 (quoting Tr. at 81). Leslie "testified that it was not abnormal for . . . Gil-Leyva to leave power tools plugged in," and on one occasion, one of the children "'grabbed a power saw

4

which had been left plugging [sic] in in the kitchen, and turned it on." Id. (quoting Tr. at 81–82). Leslie testified that she "was able to run over and unplug it" before the child could be injured. Id. (quoting Tr. at 81).

The magistrate judge concluded that, even accepting all of Leslie's testimony as true, Leslie "failed to carry her burden [of] proving by clear and convincing evidence that . . . Gil-Leyva present[ed] a grave risk of harm to the children." Id. at 305. "Regarding neglect," the magistrate judge conceded that Leslie's testimony regarding Gil-Leyva's home described an "environment which may not be safe or healthy for children." Id. But the magistrate judge noted "there was no testimony about either child ever actually being hurt in the home in the years since their births," and that this was "indicative that the conditions may not have been as terrible as alleged and counsel[ed] against a finding of 'grave risk.'" Id. In addition, the magistrate judge stated that, "[e]ven if those conditions were as bad as alleged" by Leslie, the magistrate judge was "not ordering the children to be returned to Canada to live in the same household as their father." Id. at 305–06. Consequently, the magistrate judge concluded that "the children must be returned to Canada . . . ." Id. at 306.

Regarding the appropriate remedy, the magistrate judge directed that, "[t]o the extent permitted by Canadian law, . . . Leslie [could], consistent with" the magistrate judge's order, "accompany the children back to Canada and take up her own residence with them there, continuing to exclude . . . Gil-Leyva from access to the children while simultaneously making her case to the appropriate Canadian court that . . . Gil-Leyva's asserted abuse and other conduct should preclude him from even partial custody." Id. at

5

307. "As another alternative," the magistrate judge stated, Leslie could "theoretically return the children to Canada and place them in the custody of family, a friend, or foster care, rather than turning them over to . . . Gil-Leyva, at least until Canadian authorities determine[d] how custody [wa]s to be apportioned." Id. "Further," the magistrate judge stated, "the children" were not required "to even live in the same town as . . . Gil-Leyva." Id.

III

In my view, Leslie's testimony, at least if deemed credible, clearly establishes that the children will not be adequately protected from harm if they are returned to the sole custody of Gil-Leyva (and no one has suggested that Leslie, even assuming that she can legally return to Canada for an extended period, should be expected to live with the children in Gil-Leyva's residence in order to protect them).

Leslie's testimony on the issue of neglect made clear that she was the children's sole caretaker from the time of their births until she took them to Colorado. Although Leslie and the children resided with Gil-Leyva, Gil-Leyva was not an active presence in the children's lives and, indeed, he posed threats to them by way of his serious neglect. To begin with, Leslie testified that Gil-Leyva's use of prescription medications, alcohol, and marijuana resulted in him having an erratic waking and sleeping pattern, as well as, at least at times, acting manically. On one of the approximately four or five total occasions that Leslie left the children in Gil-Leyva's care, she returned to find the children awake, but Gil-Leyva in a narcotic-induced, unrousable sleep, completely unaware of the children's actions. Further, Leslie testified that Gil-Leyva's activities and

6

hobbies inside the house created numerous hazards to the children, including sewing machine parts, power tools that were left plugged in, solvents, screws, nails, glues, and choking hazards strewn around the house. Gil-Leyva also, according to Leslie, went through a phase where he would boil solvents on the stove, melt pennies on the stove, and cook vehicle parts in the oven. The fumes from these activities, according to Leslie, were noxious and made the home temporarily uninhabitable. Lastly, according to Leslie, Gil-Leyva routinely left his prescription medication bottles open (because the child-safe lids were apparently too difficult for him to regularly remove) and within reach of the children. On one occasion, according to Leslie, she discovered one of the children in possession of an open bottle of a psychotropic prescription medication.

Although the magistrate judge seemed to place significant weight on the fact that neither of the children had been injured while living with Gil-Leyva, she ignored the fact that this was precisely because Leslie, their sole caretaker, was present to protect the children from the various hazards created by Gil-Leyva. The record firmly establishes, at least if Leslie is deemed credible, that Gil-Leyva is ill-equipped to personally care for the children without Leslie and to protect them from the various hazards he has created in his home.

In terms of the categorical framework created by the Sixth Circuit in Simcox, I think the circumstances described by Leslie reasonably places the case within the most extreme of the three categories because it involves "serious neglect" on the part of Gil-Leyva, and that serious neglect, combined with Leslie's absence and the various hazards present in Gil-Leyva's house, creates the very real potential for serious physical harm

7

occurring to the children and thus places them in an intolerable situation. Moreover, even if, for purposes of argument, we were to place the case in the middle category, the record is totally silent with respect to any enforceable undertakings that might ameliorate the risk of harm to the children if they were returned to reside with Gil-Leyva in his home.

To be sure, the magistrate judge suggested in her discussion of remedy that the children could return to Canada but not to Gil-Leyva's custody. Specifically, the magistrate judge noted that, "to the extent permitted by Canadian law, . . . Leslie [could] . . . accompany the children back to Canada and take up her own residence with them there, continuing to exclude . . . Gil-Leyva from access to the children while simultaneously making her case to the appropriate Canadian court that . . . Gil-Leyva's asserted abuse and other conduct should preclude him from even partial custody . . . ." Dist. Ct. Docket No. 56 at 16. "As another alternative," the magistrate judge noted, "Leslie [could] theoretically return the children to Canada and place them in the custody of family, a friend, or foster care, rather than turning them over to . . . Gil-Leyva, at least until Canadian authorities determine how custody is to be apportioned." Id.

The problem, however, is that there is no evidence in the record that establishes either of these as reasonable options. With respect to the first option, i.e., Leslie returning to live alone with the children in Canada, Leslie testified that, while she lived in Canada with Gil-Leyva, she "was not able to legally work" due to her immigration status and, thus, she was financially dependent upon Gil-Leyva. Dist. Ct. Docket No. 46 at 76. Presumably, the same would hold true if Leslie were to return to Canada with the children.

8

Relevant to this point is a document entitled "Revised draft Guide to Good Practice on Article 13(1)(b) of the 1980 Convention" that was recently issued by the Council on General Affairs and Policy of the Hague Conference on Private International Law. Hague Conf. on Private Int'l Law, Council on General Affairs and Policy of the Conf., Revised draft Guide to Good Practice on Article 13(1)(b) of the 1980 Convention (Feb. 7, 2019), https://www.hcch.net/en/governance/council-on-general-affairs. This document recognizes that sometimes "the taking parent claims to be unable to return with the child to the State of habitual residence because of their difficult or untenable economic situation, *e.g.*, because his/her living standard would be lower, he/she is unable to find employment in the State, or is otherwise in dire circumstances . . . ." Id. at 25. Continuing, the document states: "In assessing such circumstances, courts may examine evidence or information presented by the parent regarding his or her financial and employment status, *e.g.*, their savings or assets, employment possibilities, and alternative means of support, as well as his or her eligibility for social security or welfare payments, either from the requested State or the State of habitual residence." Id. at 25–26. All of which leads me to conclude that the magistrate judge in this case, before suggesting that Leslie could return to Canada and live alone with the children, should have explored Leslie's financial situation (e.g., her savings and other means of financial support) and, in turn, her ability to live in Canada with the children for the period of time necessary to litigate custody proceedings there.

As for the second option mentioned by the magistrate judge, i.e., Leslie "return[ing] the children to Canada and plac[ing] them in the custody of family, a friend,

9

or foster care, rather than turning them over to . . . Gil-Leyva," there is literally no evidence in the record that establishes that as a reasonable option. Specifically, neither Leslie nor Gil-Leyva mentioned any family members or friends who both reside in Canada and are able and willing to care for the children for an extended period.

IV

In conclusion, I believe that the harm analysis in this case "depend[s] on the circumstances in which the children w[ill] live[] when" and if "they return[] to" Canada. Neumann v. Neumann, 684 F. App'x 471, 481 (6th Cir. 2017). I therefore vote to reverse the judgment of the district court and to remand the case to the magistrate judge for further proceedings. If, after hearing additional evidence, the magistrate judge finds that the only reasonably available custody arrangement for the children in Canada is returning to live alone with Gil-Leyva, then, in my view, Leslie has met her burden of establishing the Section 13(b) exception for grave risk of physical harm. If, on the other hand, additional evidence establishes that other reasonable custody arrangements exist, then Leslie will not have established the exception.

10